IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DANIEL PATRICK BENJAMIN,

      Petitioner,                 No. 2:03-cv-1166 FCD KJN P

    vs.                       FINDINGS AND RECOMMENDATIONS

KATHLEEN PROSPER, et al.,

      Respondents.

_____/

I.     Introduction

      Petitioner is a former state prisoner proceeding through counsel with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his 2001 conviction for petty theft with a prior (Cal. Penal Code §§ 666, 484) and possession of ephedrine and/or pseudoephedrine with the intent to manufacture methamphetamine (Cal. Health & Saf. Code § 11383 (c)(1)). Petitioner was sentenced to twelve years in state prison.

      When petitioner filed this action, he was incarcerated in state prison. Since that time, petitioner has been released from prison and is no longer on parole. To the extent petitioner's claims challenge the validity of his conviction, his claims are not moot.

////

////

1     This action is proceeding on the third amended petition filed March 22, 2006,

2  raising twenty claims.  Dkt. No. 39.  On May 22, 2006, respondent filed an answer.  Dkt. No. 40.

3  On July 21, 2006, petitioner filed a traverse.  Dkt. No. 44.

4     After carefully considering the record, the undersigned recommends that the

5  petition be denied.

6  II.     Anti-Terrorism and Effective Death Penalty Act ("AEDPA")

7     In Williams (Terry) v. Taylor, 529 U.S. 362 (2000), the Supreme Court defined

8  the operative review standard in a habeas corpus action brought pursuant to 28 U.S.C. § 2254.

9  Justice O'Connor's opinion for Section II of the opinion constitutes the majority opinion of the

10  court.  There is a dichotomy between "contrary to" clearly established law as enunciated by the

11  Supreme Court, and an "unreasonable application of'" that law.  Id. at 405.  "Contrary to" clearly

12  established law applies to two situations:  (1) where the state court legal conclusion is opposite

13  that of the Supreme Court on a point of law; or (2) if the state court case is materially

14  indistinguishable from a Supreme Court case, i.e., on point factually, yet the legal result is

15  opposite.

16     "Unreasonable application" of established law, on the other hand, applies to

17  mixed questions of law and fact, that is the application of law to fact where there are no factually

18  on point Supreme Court cases which mandate the result for the precise factual scenario at issue.

19  Id. at 407-08.  It is this prong of the AEDPA standard of review which directs deference be paid

20  to state court decisions.  While the deference is not blindly automatic, "the most important point

21  is that an *unreasonable* application of federal law is different from an incorrect application of

22  law....[A] federal habeas court may not issue the writ simply because that court concludes in its

23  independent judgment that the relevant state-court decision applied clearly established federal

24  law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 410-

25  11 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the

26  ////

2

1   objectively unreasonable nature of the state court decision in light of controlling Supreme Court

2   authority.  Woodford v. Viscotti, 537 U.S. 19 (2002).

3   "Clearly established" law is law that has been "squarely addressed" by the United

4   States Supreme Court.  Wright v. Van Patten, 552 U.S. 120 (2008).  Thus, extrapolations of

5   settled law to unique situations will not qualify as clearly established.  See e.g., Carey v.

6   Musladin, 549 U.S. 70, 76 (2006) (established law not permitting state sponsored practices to

7   inject bias into a criminal proceeding by compelling a defendant to wear prison clothing or by

8   unnecessary showing of uniformed guards does not qualify as clearly established law when

9   spectators' conduct is the alleged cause of bias injection).

10   The state courts need not have cited to federal authority, or even have indicated

11   awareness of federal authority, in arriving at their decision.  Early v. Packer, 537 U.S. 3 (2002).

12   Nevertheless, the state decision cannot be rejected unless the decision itself is contrary to, or an

13   unreasonable application of, established Supreme Court authority.  Id.  An unreasonable error is

14   one in excess of even a reviewing court's perception that "clear error" has occurred.  Lockyer v.

15   Andrade, 538 U.S. 63, 75-76 (2003).  Moreover, the established Supreme Court authority

16   reviewed must be a pronouncement on constitutional principles, or other controlling federal law,

17   as opposed to a pronouncement of statutes or rules binding only on federal courts.  Early v.

18   Packer, 537 U.S. at 9.

19   However, where the state courts have not addressed the constitutional issue in

20   dispute in any reasoned opinion, the federal court will independently review the record in

21   adjudication of that issue.  "Independent review of the record is not de novo review of the

22   constitutional issue, but rather, the only method by which we can determine whether a silent state

23   court decision is objectively unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.

24   2003).

25   ////

26   ////

3

When reviewing a state court's summary denial of a claim, the court "looks through" the summary disposition to the last reasoned decision.  Shackleford v. Hubbard, 234 F.3d 1072, 1079 n. 2 (9th Cir. 2000).

The California Court of Appeal was the last state court to issue a reasoned decision addressing petitioner's claims 17-19 herein.  No state court issued a reasoned decision addressing the remaining claims.  Accordingly, the undersigned independently reviews the record in order to determine whether the summary denial of these claims by the California Supreme Court in the order denying petitioner's state habeas petition was an unreasonable application of clearly established Supreme Court authority.

III.   Background

The opinion of the California Court of Appeal contains a factual summary.  After independently reviewing the record, the undersigned finds this summary to be accurate and adopts it herein:

> Facts and Procedural History
> A security guard monitored defendant and a companion, Andrea Sutch, on video surveillance cameras as they walked through store aisles. The guard saw Sutch take three handfuls of Sudafed packages and place them in the shopping cart. The pair then walked to another aisle, where defendant took a pail of margarita mix, slowly popped open the top, removed the pail's contents, and placed the Sudafed inside the empty pail. He then placed bags of lentils on top of the pills, and closed the pail.
>
> At the checkout counter, defendant and Sutch paid for the margarita mix but not the contents that had been placed inside the pail. As Sutch pushed the cart out of the store, the security guard stopped them.
>
> The guard opened the pail of margarita mix, and discovered 12 boxes of Sudafed, valued at $5.62 apiece, and two bags of lentils, priced at $1.59 each. Defendant had $10 in his possession, and Sutch had $300.
>
> Defendant was charged with petty theft with a prior conviction, and possession of ephedrine or pseudoephedrine with intent to manufacture methamphetamine. Sutch was charged with the same offenses, but her case was severed from that of defendant.
>
> The prosecution sought to introduce evidence of defendant's prior conviction for manufacturing methamphetamine, arguing this evidence was relevant to establish defendant's intent on this occasion. The court ruled this evidence admissible under

4

Evidence Code sections 1101 and 352. (Further undesignated statutory references are to the Evidence Code.) The prosecution stated it would present this evidence through a certified copy of the conviction, rather than through live testimony.

At trial, the security guard described defendant's actions in the store. A police officer testified that individuals often use Sudafed to manufacture methamphetamine. He estimated that the quantity of Sudafed in this case would have yielded more than 12 grams of methamphetamine, with a street value of $500-$600. The prosecution also introduced into evidence a multipage packet containing the certified copy of defendant's prior conviction for manufacturing methamphetamine.

Defendant introduced evidence from a police officer who spoke to Sutch at the jail. Sutch told him that she had concealed the Sudafed, and added that the officer "could let [defendant] go and she would take the rap ...." In cross-examination, the same officer said Sutch had told him previously "that she didn't know anything about how the Sudafed got in the bucket and that she didn't do it."

In closing arguments, defense counsel argued that it was Sutch, not defendant, who was guilty of the charged offenses. He challenged the accuracy of the security guard's observations, and emphasized Sutch's statement to police officers that she, and not defendant, had concealed the Sudafed.

The jury convicted defendant of both charged offenses, and the trial court found the alleged prior convictions to be true. Sentenced to an aggregate sentence of 12 years, defendant appeals.

Dkt. No. 13, Exhibit A, pp. 2-4.

IV.    Discussion

    A.    Claims 1-5

Claims 1-5 concern the alleged bias of juror No. 8025.  The background to these claims is as follows:

During voir dire, the trial court asked the jury if any of them had a family member or a close friend who had been charged with petty theft or methamphetamine use or who had a problem with methamphetamine.  (Reporter's Augmented Transcript ("RAT") at 42-43).  In response, juror No. 8025 responded,

Juror No. 8025:  About three years ago there was living quarters in the front of my shop area and my sister-in-law lived there with her boyfriend and NET-5 come in and broke in the front door and ran the drug dogs through there and I just happened to pull up and they started to knock down my door in but I had keys and

////

they found drugs, stolen merchandise, stolen credit cards, loaded shotgun behind the door and he ended up going to jail.

Court: The items that you just indicated were found in the area that your brother-in-law was residing in?

Juror No. 8025: Yes.  And when they first come he threw some drugs–there was like a space in between the trusses between his shop area and my shop area and he threw some drugs over in my shop area trying to get rid of them.

(RAT at 48-49.)

Later, the prosecutor asked Juror No. 8025 further questions about the NET-5 bust of his shop:

Prosecutor:  Mr. XXXXX (8025), you told us how NET-5 broke down your door. Was there anything about what they did and how they handled searching your shop that–

Juror No. 8025: Well, I had to pay for the doors that broke up, microwave and when I was there at the shop he got released right away and then when I was at the shop working I kept a loaded 12-gauge because of the riffraff coming in and out and 2 and 2 go together.  Drugs and stealing.

Prosecutor: So NET-5 didn't pay for your door?

Juror No. 8025: No.  Or the microwave.

Prosecutor: What happened to the microwave?

Juror No. 8025: The battering ram, when they used the battering ram I had the microwave behind the door because I didn't come and go through that area so the battering ram went through the door and toasted the microwave.

Prosecutor: Could you sit and hear this case on the facts that we present and the evidence that we present and not think about your microwave and your door?

Juror No. 8025: No.  Because it's like once you get to a certain point I hate to say it, he's kind of made it here.  To me if he's made it here, he's either running with the wrong group that are doing that or he's guilty.

Prosecutor: Would you be able to sit here and hear the evidence and if I do not prove the case, return a not guilty verdict?

Juror No. 8025: No.  Because he's got strikes against him already just because he's here.

Prosecutor: Just because he got arrested?

Juror No. 8025: Yeah.

Prosecutor: Would you agree that everybody in this country has the right to have a case proven against them beyond a reasonable doubt?

Juror No. 8025: Not in all cases.

Prosecutor: Thank you.  I have no further questions, Your Honor.

(RAT at 54-55.)

The trial judge then called the prosecutor and defense counsel into chambers and asked if they wanted to strike any of the prospective jurors based on the information they had elicited.  (RAT at 55.)  The prosecutor asked that jurors Valdez and Alvarez-Bonilla be struck for cause.  (RAT at 56.)

Starting with Evelyn Valdez she has sons who died of car crash due to methamphetamine.  She admitted she couldn't be fair.  Ms. Alvarez-Bonilla similarly.  If family members were not fairly treated by law enforcement, she stated she could not be fair.  She doesn't think that people should be punished for having drug problems.  She doesn't think people should go to jail.  I think she's biased...

(RAT at 56-57.)

The prosecutor also stated that juror No. 8025 should be struck for cause because "[h]e said he couldn't be fair."  (RAT at 57.)  Defense counsel also moved to strike juror No. 8025 for cause:  "As to Mr. XXXXX (8025) different reasons, same result.  I think the totality of the circumstances he's presented us with today not just the single incident point towards cause."  (RAT at 57.)  Regarding the other jurors, defense counsel stated, "On Valdez the same.  On Alvarez-Bonilla I would simply make the same observations in fairness that I've already made about Mr. Dombo.  This feels more like an effort to get out of here than it does–."  (RAT at 57.)

The trial judge denied the joined motion to strike juror No. 8025 for cause:

Just my observations on these individuals, these four individuals that you have discussed.  Mr. XXXXX (8025) and Ms. Alvarez-Bonilla appear to me at this juncture to be trying to state a reason to get off the jury.  This follows the dismissal of Dombo, Gebert and Smith.  The questions that we were asking on drug usage do not go directly to what is charged in this case.  Their opinions on

7

drug usage are areas that either of you may wish to make additional follow-up questions. I'll allow you to give that a go in chambers if you wish. However, my conclusion is at this point is that each of these individuals the way they answered the question they're looking around, if you will, they were aware of their audience, if you will, they were picking up ...thread of ways in my opinion to get out of their service here today. They did not state a reason concerning the merits of this case as to why they should be excused for cause...

(RAT at 57-58.)

The trial judge then denied the motion to excuse juror No. 8025 for cause and asked trial counsel and the prosecutor if they wished to call this juror in for further questioning. (RAT at 58.) Both trial counsel and the prosecutor declined to ask juror No. 8025 further questions. (Id.)

Neither party exercised a peremptory strike to have juror No. 8025 removed from the jury.

*Claim 1*

Petitioner argues that he was denied his right to an impartial jury when the trial judge refused to dismiss juror No. 8025 for cause.

The Sixth Amendment guarantees to the criminally accused a fair trial by a panel of impartial jurors. Irvin v. Dowd, 366 U.S. 717, 722 (1961). "Even if only one juror is unduly biased or prejudiced, the defendant is denied his constitutional right to an impartial jury." Tinsley v. Borg, 895 F.2d 520, 523-24 (9th Cir. 1990) (internal quotations omitted). The Constitution, however, "does not require a new trial every time a juror has been placed in a potentially compromising situation." Smith v. Phillips, 455 U.S. 209, 217 (1982). Rather, the safeguards of juror impartiality, such as voir dire and protective instructions from the trial judge, are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. Smith, 455 U.S. at 217.

The Ninth Circuit has recognized that to disqualify a juror for cause requires a showing of actual bias or implied bias; that is, "bias in fact, or bias conclusively presumed as a matter of law." United States v. Gonzalez, 214 F.3d 1109, 1111-12 (9th Cir. 2000). There are

three theories of juror bias based on a misstatement by a juror during voir dire:

(1) McDonough-style bias (i.e., the juror fails to answer honestly and, had he answered correctly, the information would have provided a basis for a challenge for cause, see McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548 (1984)), (2) "actual bias, which stems from a pre-set disposition not to decide an issue impartially," and (3) "implied (or presumptive) bias, which may exist in exceptional circumstances where, for example a prospective juror has a relationship to the crime itself or to someone involved in a trial, or has repeatedly lied about a material fact to get on the jury." Fields v. Brown, 503 F.3d 755, 766 (9th Cir. 2007) (en banc).

The presence of a biased juror is a structural error entitling the defendant to a new trial. Estrada v. Scribner, 512 F.3d 1227, 1235 (9th Cir. 2008) (citing Dyer v. Calderon, 151 F.3d 970, 973 n. 2 (9th Cir. 1998)). Presence of a biased juror is a question of fact, and accorded deference under 28 U.S.C. § 2254. Id., 512 F.3d at 1235, 1240 (citing Dyer, 151 F.3d at 973 n. 2). Actual bias is present when a juror has "a state of mind that leads to an inference that the person will not act with entire impartiality." Id., 512 F.3d 1227, 1240 (9th Cir. 2008), quoting United States v. Gonzalez, 214 F.3d 1109, 1112 (9th Cir. 2000) (internal quotation omitted).

In the instant case, petitioner argues that the trial court erred in failing to grant the joint motion to dismiss juror No. 8025 for cause. Petitioner contends that juror No. 8025 made clear statements that he could not be impartial. Petitioner further argues that the trial court's "hunch" that juror No. 8025 was lying was unsupported and even if it were true, this would render him unfit to serve.

The undersigned first considers petitioner's claim of "actual bias." The comments by juror No. 8025, on the surface, demonstrated an inability to be impartial. However, the trial judge found that these comments were insincere because they were made in an attempt to avoid jury duty. The trial judge noted that three other jurors (Dombo, Gebert and Smith) who had

////

9

1   expressed bias had just been removed and he concluded that juror No. 8025 was trying to follow

2   in their footsteps.

3        Juror Gebert had told the court that she had been previously married to a Yuba

4   City police officer.  (RAT at 20.)  Because she knew most of the officers on the police force, she

5   did not believe she could be impartial. (Id.)  She could not be impartial because she knew all the

6   hours that her husband would write reports and that "these guys would be on the streets before

7   his report was done."  (Id.)  The trial judge then read the jury instruction regarding witness

8   credibility and asked juror Gebert if she could apply the same standard when judging the

9   credibility of a police officer versus a lay person.  (RAT at 21.)  Juror Gebert responded that she

10  did not think she could.  (Id.)  After further questioning, juror Gebert stated that she would use

11  the same factors in judging the credibility of each witness.  (RAT at 22.)

12       Juror Smith told the court that she used to work at the prison in Live Oak.  (RAT

13  at 24.)  Based on that experience, she stated that she could not be an impartial juror because she

14  saw "too many inmates come back.  It was return to custody for parole violations and whatnot

15  involving drugs."  (RAT at 25.)  This experience led her to have a "bad distaste in regards to

16  drugs."  (RAT at 25.)

17       The trial judge later asked the jury if anyone had convictions or personal feelings

18  about any subject that were so strong that they did not feel they could follow the jury instructions.

19  (RAT at 32.)  In response juror Dombo stated,

20       Yes.  Because I work for a junior high school.  We preach about not doing drugs
         and not stealing and stuff like that and I feel I wouldn't be a good juror for this
21       gentleman sitting down over here.  I'd think he was guilty and send him to jail.

22  (Id.)

23       While the trial judge questioned jurors Smith, Gebert and Dombo more

24  extensively in chambers, the comments quoted above were made in front of the rest of the jurors

25  during voir dire.  Following the further questioning in chambers, jurors Smith, Gebert and

26  Dombo were dismissed.  It was not unreasonable for the trial judge to suspect that juror No. 8025

1    fabricated his comments regarding an inability to be impartial after hearing the comments of

2    these juror who were then dismissed.  This finding of fact is presumed correct under 28 U.S.C.

3    2254(e)(1) unless rebutted by clear and convincing evidence.  Petitioner has not presented clear

4    and convincing evidence that the trial judge's finding was in error.  Accordingly, the trial judge's

5    finding that juror No. 8025 was not actually biased is entitled to a presumption of correctness.

6            Moreover, while the undersigned believes that the better practice would have been

7    for the trial judge to call juror No. 8025 into chambers for further questioning, the fact that

8    neither defense counsel nor the prosecutor stated that they disagreed with the judge's conclusion,

9    nor took the judge up on his offer to allow either of them to further question this juror, suggests

10   that they agreed with the judge's conclusion that the juror's comments were motivated by an

11   attempt to avoid jury duty.  Additionally, the fact that neither defense counsel nor the prosecutor

12   later used peremptory challenges to strike this juror, which they both had, also suggests that they

13   did not find juror No. 8025's claims that he could not be impartial to be sincere.

14           Petitioner next argues that even if the trial judge's conclusion about the juror's

15   motivation was correct, then juror No. 8025's willingness to lie rendered him unfit to serve.  The

16   undersigned is aware of no clearly established Supreme Court authority standing for this

17   proposition.

18           Furthermore, the Ninth Circuit has held that the failure of the trial court to

19   sua sponte hold an evidentiary hearing to investigate *potential* juror bias is not contrary to clearly

20   established Supreme Court authority.  Sims v. Rowland, 414 F.3d 1148, 1153 (9th Cir. 2005).

21   Juror No. 8025's willingness to lie in order to avoid jury service demonstrated, at most, potential

22   bias.  Here, both defense counsel and the prosecutor declined the opportunity to call juror

23   No. 8025 in for further questioning.  Accordingly, the trial judge's failure to hold a hearing

24   sua sponte was not contrary to clearly established Supreme Court authority.

25   ////

26   ////

1    After independently reviewing the record, the undersigned finds that the denial of

2  this claim by the California Supreme Court was not an unreasonable application of clearly

3  established Supreme Court authority.

4    *Claim 2*

5    Petitioner argues that trial counsel was ineffective for failing to exercise a

6  peremptory challenge to exclude juror No. 8025.

7    The test for demonstrating ineffective assistance of counsel is set forth in

8  Strickland v. Washington, 466 U.S. 668 (1984).  First, a petitioner must show that, considering

9  all the circumstances, counsel's performance fell below an objective standard of reasonableness.

10  Id. at 688.  To this end, the petitioner must identify the acts or omissions that are alleged not to

11  have been the result of reasonable professional judgment.  Id. at 690.  The federal court must then

12  determine whether in light of all the circumstances, the identified acts or omissions were outside

13  the wide range of professional competent assistance.  Id.  "We strongly presume that counsel's

14  conduct was within the wide range of reasonable assistance, and that he exercised acceptable

15  professional judgment in all significant decisions made."  Hughes v. Borg, 898 F.2d 695, 702

16  (9th Cir. 1990) (citing Strickland, 466 U.S. at 689).

17    Second, a petitioner must affirmatively prove prejudice.  Strickland, 466 U.S. at

18  693.  Prejudice is found where "there is a reasonable probability that, but for counsel's

19  unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  A

20  reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Id.

21    In extraordinary cases, ineffective assistance of counsel claims are evaluated

22  based on a fundamental fairness standard.  Williams v. Taylor , 529 U.S. 362, 391-93 (2000)

23  (citing Lockhart v. Fretwell, 506 U.S. 364 (1993)).

24    The Supreme Court has emphasized the importance of giving deference

25  to trial counsel's decisions, especially in the AEDPA context:

26  ////

In Strickland we said that "[j]udicial scrutiny of a counsel's performance must be highly deferential" and that "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." 466 U.S. at 689. Thus, even when a court is presented with an ineffective-assistance claim not subject to § 2254(d)(1) deference, a [petitioner] must overcome the "presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Ibid. (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)).

For [petitioner] to succeed, however, he must do more than show that he would have satisfied Strickland's test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied Strickland incorrectly. See Williams, supra, at 411.[1] Rather, he must show that the [ ]Court of Appeals applied Strickland to the facts of his case in an objectively unreasonable manner.

Bell v. Cone, 535 U.S. 685, 698-99 (2002).

Establishing Strickland prejudice in the context of juror selection requires a showing that, as a result of trial counsel's failure to exercise peremptory challenges, the jury panel contained at least one juror who was biased. United States v. Quintero-Barraza, 78 F.3d 1344, 1349 (9th Cir. 1995).

As discussed above, the state court finding that juror No. 8025 was not biased is entitled to a presumption of correctness. Because juror No. 8025 was not presumably biased, petitioner's ineffective assistance of counsel claim is without merit.[2] After independently reviewing the record, the undersigned finds that the denial of this claim by the California

---

[1] This internal citation should be corrected to Williams v. Kaiser, 323 U.S. 471, 477 (1945).

[2] After hearing juror No. 8025's comments regarding the treatment of his property by NET-5, trial counsel may well have had a strategic reason for leaving him on the jury. Similarly, in light of the judge's conclusion, with apparent counsel concurrence, that juror No. 8025 was merely trying to get out of jury duty, defense counsel may have strategically decided that the juror might hold it against the prosecution that he had to continue to serve as a juror and sit through the trial. In light of such possible reasons, the undersigned cannot state that counsel was ineffective in leaving juror No. 8025 on the jury.

1   Supreme Court was not an unreasonable application of clearly established Supreme Court

2   authority.

3          *Claim Three*

4          Petitioner argues that his right to an impartial jury was violated because all of the

5   jurors in his case saw that a venire member, juror No. 8025, could presume petitioner guilty at

6   the outset but still serve on the jury.  The only federal case petitioner cites in support of this

7   claim is Mach v. Stewart, 137 F.3d 630 (9th Cir. 1997).

8          In Mach, during voir dire the trial court elicited from juror Bodkin that 1) she had

9   taken child psychology courses and worked with psychologists, she worked with children as a

10  social worker; and 2) four separate statements that she had never been involved in a case in

11  which a child accused an adult of sexual abuse where that child's statements had not been borne

12  out.  137 F.3d at 633.  The trial court also elicited a statement from juror Bodkin that she had

13  never known a child to lie about sexual abuse.  Id.  The Ninth Circuit found that when the

14  petitioner moved for a mistrial, the trial court should have conducted further voir dire to

15  determine whether the panel had been infected with Bodkin's expert-like statements.  Id.  The

16  Ninth Circuit presumed that at least one juror was tainted and entered the jury deliberations with

17  the conviction that children never lie about being sexually abused.  Id.  The Ninth Circuit held

18  that this bias violated the petitioner's right to an impartial jury.  Id.

19         Mach is distinguishable from the instant case.  At petitioner's trial, juror No. 8025

20  did not offer an expert opinion regarding the evidence.  Rather, juror No. 8025 expressed his own

21  personal opinion that he supposedly could not be impartial.  It is not likely that the other jurors,

22  who had expressed an ability to be impartial, were swayed by juror No. 8025's views, which were

23  found not to be sincere.  The undersigned is aware of no case law supporting petitioner's claim

24  that a juror who states that they cannot be impartial during voir dire, who then serves on the jury,

25  renders the entire jury biased.  Petitioner's claim is truly an extension of claim one, i.e. that juror

26  No. 8025 was biased.  In any event, it is not uncommon for jurors to express personal opinions

14

1    during voir dire suggesting an inability to be impartial which are then clarified during an

2    informal hearing outside the presence of the rest of the jury pool.

3          This claim is not supported by clearly established Supreme Court authority.

4    Accordingly, after independently reviewing the record, the undersigned finds that the denial of

5    this claim by the California Supreme Court was not an unreasonable application of clearly

6    established Supreme Court authority.

7          *Claim 4*

8          Petitioner argues that his trial counsel was ineffective for failing to move for a

9    mistrial on grounds that the entire jury was biased.  Petitioner argue that trial counsel should have

10   moved for a mistrial on ground that juror No. 8025 was biased and unfit to serve as a juror.

11   Petitioner also argues that his trial counsel should have argued that the entire jury was tainted

12   because all jurors heard juror No. 8025's comments.

13          Under California law, "'[a] mistrial should be granted if the court is apprised of

14   prejudice that it judges incurable by admonition or instruction.  Whether a particular incident is

15   incurably prejudicial is by its nature a speculative matter, and the trial court is vested with

16   considerable discretion in ruling on mistrial motions.'" <u>People v. Wallace</u>, 44 Cal.4th 1032,

17   1068 (2008) (internal citations omitted).

18          As discussed above, the state court's finding that juror No. 8025 was not biased is

19   entitled to a presumption of correctness.  Therefore, a motion for a mistrial based on alleged bias

20   by juror No. 8025 had no merit, nor was petitioner prejudiced by counsel's failure to make such a

21   motion.

22          After independently reviewing the record, the undersigned finds that the denial of

23   this claim by the California Supreme Court was not an unreasonable application of clearly

24   established Supreme Court authority.

25   ////

26   ////

*Claim 5*

Petitioner argues that appellate counsel was ineffective for failing to raise grounds 1-4 on appeal.  A claim of ineffective assistance of appellate counsel uses the same <u>Strickland</u> standard that is applied to trial counsel.  <u>Smith v. Robbins</u>, 528 U.S. 259, 287 (2000).

Because these claims are without merit, petitioner was not prejudiced by appellate counsel's failure to raise these claims on appeal.  In addition, petitioner raised these claims in a habeas corpus petition which the California Supreme Court denied on the merits.  <u>See</u> Petitioner's Habeas Petition filed in California Supreme Court, lodged June 1, 2006. The outcome would have been no different had these claims been raised on direct appeal.

After independently reviewing the record, the undersigned finds that the denial of this claim by the California Supreme Court was not an unreasonable application of clearly established Supreme Court authority.  Accordingly, this claim should be denied.

B.  <u>Claims 6-11</u>

The background to these claims is as follows.  Both petitioner and Andrea Sutch were charged with petty theft with a prior and possession of ephedrine with the intent to manufacture methamphetamine.  (Clerk's Transcript ("CT") at 16-17.)  After the trial court ruled that petitioner's prior conviction for manufacturing methamphetamine could be admitted, Sutch's counsel requested that her trial be severed from petitioner's trial.  (CT at 63-64.)  The trial court granted this request.  (CT at 64).  After this motion was granted, the prosecutor requested that petitioner be tried first.  (<u>Id</u>.)  Petitioner's counsel objected:

> Your Honor, the People are making essentially a judicial economy argument versus right to confrontation argument.  What they are saying is because Mr. Benjamin is in their opinion the primary actor that settling this case would make it very easy to give whatever offer they are going to give Miss Sutch.
>
> Although I'm not attempting to enter this into the record, I would indicate on the last page of the police report at booking at the jail without time for any information to be exchanged between the defendants, without pressure being able to be applied, Miss Sutch said she did it all.  Let Benjamin go.  She will take the blame for the theft.  That's a pretty important statement, your Honor.  Of course, there being an in limine motion filed to that statement coming in.  I believe that's

16

1   fairly intriguing testimony on behalf of Mr. Benjamin and his defense.  I would
    think relative to his right to confront witnesses against him or to have information
2   relative to be entered, it is better for Mr. Benjamin's rights that Miss Sutch go
    first, that she be available no matter what the outcome as a witness in
3   Mr. Benjamin's case.

4   Further, the individuals – observations by the individual who was watching these
    two would lend credence that she was not an unknowing dupe, that she was
5   actively involved in all aspects of this alleged crime.  That would be our request.
    That if we are going to do it on different days, they go first.

6

7   (CT at 64-65.)

8           The trial judge ruled that petitioner would go to trial first.  (CT at 66.)

9           When petitioner called Sutch to testify at trial, she exercised her Fifth Amendment

10  right to be silent.  (Reporter's Transcript ("RT") at 240-43.)  During this proceeding, as well as

11  during the entire proceedings, Sutch was represented by counsel.

12          During his examination of the arresting officer, petitioner's counsel asked if Sutch

13  made any statements when they arrived at jail.  The arresting officer responded, "At the jail she

14  told me that she took the Sudafed."  (RT at 249.)  The arresting officer further testified, "She said

15  that she put the Sudafed or concealed it in a pail or bucket and that I could let Mr. Benjamin go

16  and she would take the rap or something to that effect."  (Id.)

17          On cross-examination, the arresting officer testified that before telling him that

18  petitioner was not responsible, Sutch had stated to him that "she didn't know anything about how

19  the Sudafed got in the bucket and she didn't do it."  (Id.)

20          On March 26, 2001, after petitioner was found guilty, Sutch plead guilty to

21  misdemeanor theft with a prior.  (Petitioner's Exhibit 2.)  The second charge of possession of

22  ephedrine was dismissed.  (Id.)  Sutch was sentenced to one day of county jail time with credit

23  for time served, 36 months of probation, a $221 fine and restitution of $10.  (Petitioner's

24  Exhibit 3.)

25          On April 9, 2001, Sutch wrote a letter stating that she was the one who put the

26  Sudafed in the bucket.  (CT at 276-78.)  She wrote, "The first moment that Danny realized that I

                                                17

was serious about buying Sudafed for an old acquaintance that was also there, he began telling me that I was whacked (stupid) and walked away leaving me to shop alone.  I can't tell you exactly where he went, but it was then that I made the most ignorant decision..." (Id.)  In this letter, Sutch states that on the first day of court, she planned to make an appointment to meet with the D.A. and tell them what really happened.  (Id.)  She returned home early and caught petitioner with an ex-girlfriend.  (Id.)  Sutch was devastated and "lost it."  (Id.)  "So out of pure spite to ruin some of the fun he was having I said nothing of his innocence."  (Id.)  In this letter Sutch states that she would be willing to take a lie detector test.  (Id.)

Attached to the third amended petition as exhibit 1 is the declaration of Linda Humble, an investigator for petitioner's counsel.  Ms. Humble states that on September 13, 2004, she interviewed Sutch who told her that she asserted her rights under the Fifth Amendment, and refused to testify at petitioner's trial, because the prosecutor told her that the prosecution would seek prison time on her case if she testified on petitioner's behalf.

*Claim 6*

Petitioner argues that he was denied his right to a fair trial based on the prosecutor's failure to grant Sutch use immunity for her testimony at his trial in conjunction with the prosecutor's manipulation of the order in which the cases were prosecuted and the threats to retaliate against Sutch if she testified.

If a trial court unduly interferes with a defense witness' choice whether to testify, the trial court's conduct may amount to a due process violation.  Webb v. Texas, 409 U.S. 95, 97-98 (1972) (defense witness influenced not to testify by intimidating remarks of trial judge). Although the Supreme Court has not yet considered whether similar interference by a prosecutor would violate a defendant's due process rights, the Ninth Circuit has extended the rule of Webb to encompass the conduct of prosecutors as well. See Earp v. Ornoski, 431 F.3d 1158, 1167-68 (9th Cir. 2005) (prosecutor's intimidating threats to prevent witness from testifying may amount to misconduct; case remanded for evidentiary hearing); United States v. Vavages, 151 F.3d 1185,

1189-90 (9th Cir. 1998) (holding that a prosecutor's conduct is also governed by Webb, and asserting that "a defendant's constitutional rights are implicated only where the prosecutor or trial judge employs coercive or intimidating language or tactics that substantially interfere with a defense witness' decision whether to testify.").

In her letter to the court immediately following her sentencing, Sutch stated that she chose not to tell the truth at the time of petitioner's trial because she was mad at him for being with an ex-girlfriend.  In this letter, Sutch makes no mention of any fear of further prosecution.  Her statement to petitioner's investigator that she did not testify out of fear of further prosecution contradicts her letter.  The declaration by petitioner's investigator does not explain this contradiction.  Based on these conflicting statements, the undersigned cannot find that petitioner has demonstrated that Sutch's decision to testify was caused by improper interference by the prosecution.

In any event, assuming Sutch's later version of events is true, the undersigned finds no improper government interference.  In essence, Sutch is suggesting that the prosecutor offered to allow her to plead to a misdemeanor petty theft charge on the condition that she not accept responsibility for the stolen Sudafed.  Had she accepted responsibility for stealing the Sudafed, she would have received a prison sentence.  This was not an unreasonable representation by the prosecutor because had Sutch testified that she stole the Sudafed, she would have exposed herself to prosecution for a felony offense that involved prison time.  Where, under the totality of the circumstances, "'the substance of what the prosecutor communicates to the witness is a threat over and above what the record indicates is necessary, and appropriate, the inference that the prosecutor sought to coerce a witness into silence is strong.'"  United States v. Pierce, 62 F.3d 818, 832 (6th Cir. 1995) (quoting United States v. Jackson, 935 F.2d 832, 847 (7th Cir. 1991)).  In the instant case, what the prosecutor allegedly communicated to Sutch was not over and above what the record indicated.  Moreover, Sutch made the decision not to testify after consulting with her lawyer.

1    In addition, to succeed on the claim that the prosecutor improperly interfered with

2  Sutch's decision to testify, petitioner must demonstrate that the witnesses' testimony would have

3  "been both material and favorable to his defense." United States v. Valenzuela-Bernal, 458 U.S.

4  858, 867 (1982) (footnote omitted).  Evidence is material if it might have affected the outcome of

5  the trial.  Id.  For the following reasons, the undersigned finds that had the jury heard Sutch

6  testify, it is extremely unlikely that the outcome of the trial would have been different.

7    In her letter to the court, Sutch states that she put the Sudafed in the margarita

8  bucket.  (CT at 276.)  In contrast, Yuba County Sheriff's Deputy Jensen testified that while

9  working as a security guard at Winco, he watched Sutch take three handfuls of Sudafed and put

10  them in the shopping cart.  (RT at 189.)  He next saw petitioner take a margarita mix pail and

11  slowly begin to pop the lid off.  (RT at 190.)  After getting the lid partially off, petitioner put the

12  bucket in the cart and finished popping the lid off as he walked down the aisle.  (RT at 191.)

13  Petitioner then removed the contents of the pail, which was a bag of liquid, and put it on a shelf.

14  (RT at 192.)  Petitioner then filled up the bucket with the Sudafed.  (RT at 193.)  Petitioner later

15  put some lentils on top of the Sudafed.  (Id.)  Deputy Jensen testified that he did not see Sutch

16  put the Sudafed in the margarita container or touch the lentils.  (RT at 194.)  After petitioner put

17  the lentils in the bucket, he secured the lid.  (Id.)

18    Sutch's version of events directly contradicted Deputy Jensen's version.  It is very

19  likely that a jury would have disbelieved Sutch because she had a motive to lie in order to protect

20  petitioner and because she had, at one point, stated that petitioner was responsible for the stolen

21  Sudafed.  Whereas Deputy Jensen was credible, Sutch was not.  For this reason, the undersigned

22  finds that Sutch's testimony was not material.  On that ground, petitioner's claim that the

23  prosecutor improperly influenced Sutch not to testify should be denied.

24    As a separate claim, petitioner argues that the prosecutor violated his

25  constitutional rights by failing to grant Sutch use immunity.  A criminal defendant is not entitled

26  ////

20

1    to compel the government to grant immunity to a witness.  United States v. Shirley, 884 F.2d

2    1130, 1133 (9th Cir. 1989).

3           The Ninth Circuit has recognized an exception to this rule in cases where the

4    fact-finding process is intentionally distorted by prosecutorial misconduct, and the defendant is

5    thereby denied a fair trial.  United States v. Lord, 711 F.2d 887, 892 (9th Cir. 1983).  However,

6    there is no clearly established Supreme Court authority in support of this exception.

7    Nevertheless, in Williams v. Woodford, 384 F.3d 567 (9th Cir. 2004), the Ninth Circuit applied

8    this exception in a habeas corpus action.  The prosecution's refusal to grant use immunity to a

9    defense witness denies the defendant a fair trial only when the defendant can prove:  (1) the

10   witness's testimony would have been relevant; and (2) the prosecution refused to grant the

11   witness use immunity with the deliberate intention of distorting the fact-finding process.

12   Williams, 384 F.3d at 600 (emphasis added).

13          As for the first prong of the Williams v. Woodford test, Sutch's testimony,

14   although not particularly helpful, would have been relevant.  To demonstrate the prosecutorial

15   misconduct of the second prong, petitioner must show that the prosecution intentionally caused

16   Sutch to invoke the Fifth Amendment right against self-incrimination.  Williams, 384 F.3d at

17   600.  For the same reasons the undersigned above found that the prosecutor did not improperly

18   interfere with Sutch's decision not to testify, the undersigned finds that petitioner has not

19   demonstrated prosecutorial misconduct.

20          After independently reviewing the record, the undersigned finds that the denial of

21   this claim by the California Supreme Court was not an unreasonable application of clearly

22   established Supreme Court authority.  Accordingly, this claim should be denied.

23          *Claim 7*

24          Petitioner argues that his trial counsel was ineffective for failing to request that

25   the trial court order that Sutch be granted immunity for any testimony she gave in petitioner's

26   ////

1 case.  In the alternative, petitioner argues that his counsel should have moved for a judgment of

2 acquittal based on the prosecution's failure to grant use immunity.

3        The California Supreme Court has not directly addressed the issue of whether

4 courts possess the authority to confer immunity on potential witnesses absent the consent of the

5 prosecution.  However, in dicta, the California Supreme Court stated:  "if immunity for a defense

6 witness is ever constitutionally compelled, it is so compelled only when the witness's testimony

7 is both clearly exculpatory and essential to an effective defense, and when no strong

8 governmental interest weighs against the grant of immunity."  People v. Cudjo, 6 Cal.4th 585,

9 620 (1993).

10        As discussed above, Sutch's claim that she put the Sudafed in the margarita

11 bucket was not credible.  Rather, it was a fairly obvious attempt to help petitioner avoid being

12 convicted.  For these reasons, the undersigned does not find that her testimony was clearly

13 exculpatory and essential to petitioner's defense.  Because the trial court would most likely have

14 denied a request by trial counsel that Sutch be granted use immunity, petitioner's claim that

15 counsel was ineffective for not making such a request is without merit.

16        Petitioner also argues that his trial counsel should have moved to dismiss the

17 charges based on the prosecutor's misconduct in connection with Sutch's decision not to testify.

18 The undersigned presumes that petitioner is arguing that the grounds of this motion would be

19 based on relevant state law.

20        The California standards for claims of interference with the right to present

21 witnesses are similar to those under federal law.  To prevail on a claim of interference with the

22 right to present witnesses, a defendant must demonstrate, first, misconduct on the part of the

23 prosecutor. "To do so, he is not required to show that the governmental agent involved acted in

24 bad faith or with improper motives.  Rather, he need show only that the agent engaged in activity

25 that was wholly unnecessary to the proper performance of his duties and of such a character as

26 ////

1   'to transform [a defense witness] from a willing witness to one who would refuse to testify....'"

2   In re Martin, 44 Cal.3d 1, 31, 241 Cal.Rptr. 263 (1987) (internal citations omitted).

3            Second, "the defendant must also demonstrate interference, i.e., a causal link

4   between the misconduct and his inability to present witnesses on his own behalf.  To do so, he is

5   not required to prove that the conduct under challenge was the 'direct or exclusive' cause.

6   Rather, he need only show that the conduct was a substantial cause.  The misconduct in question

7   may be deemed a substantial cause when, for example, it carries significant coercive force and is

8   soon followed by the witness's refusal to testify."  Id. (internal citations omitted).

9            "Finally, the defendant must also demonstrate 'materiality.'  To carry his burden

10   under federal law, 'he must at least make some plausible showing of how [the] testimony [of the

11   witness] would have been both material and favorable to his defense.'  Under California law he

12   must show at least a reasonable possibility that the witness could have given testimony that

13   would have been both material and favorable."  Id. at 32 (internal citations omitted).

14            For the reasons discussed above, the undersigned finds that the prosecutor did not

15   engage in activity that was wholly unnecessary to the proper performance of his duties.  In

16   addition, petitioner has not demonstrated a link between the alleged misconduct and Sutch's

17   decision not to testify.  Petitioner has not adequately explained the contradictory reasons given by

18   Sutch for her decision not to testify.  In fact, at the time petitioner claims counsel should have

19   made the motion for acquittal, Sutch's version of events was that she did not tell the truth

20   because she was mad at petitioner for being with another woman.  Finally, for the reasons

21   discussed above, the undersigned finds that petitioner has not demonstrated that Sutch's

22   testimony was material.  Because a motion for acquittal based on prosecutorial misconduct

23   almost certainly would have been denied, petitioner's counsel was not ineffective for not making

24   this motion.

25   ////

26   ////

1    After independently reviewing the record, the undersigned finds that the denial of

2    these claims by the California Supreme Court was not an unreasonable application of clearly

3    established Supreme Court authority.  Accordingly, these claims should be denied.

4         *Claim 8*

5    Petitioner argues that his appellate counsel was ineffective for failing to argue on

6    appeal that petitioner was deprived of his right to due process by the prosecutor's manipulation

7    of the judicial system to prevent his co-defendant from testifying.  In support of this claim,

8    petitioner cites the grounds set forth in claim 6.

9    As discussed above, claim 6 has no merit.  Had appellate counsel raised this claim

10   on appeal, it almost certainly would have been denied.  Moreover, petitioner raised this claim in a

11   habeas corpus petition filed in the California Supreme Court.  See Petitioner's Habeas Petition

12   filed in the California Supreme Court, lodged June 1, 2006.  This petition was denied on the

13   merits.  The outcome would have been no different had these claims been raised on direct appeal.

14   Petitioner was not prejudiced by appellate counsel's failure to raise this claim.

15   After independently reviewing the record, the undersigned finds that the denial of

16   this claim by the California Supreme Court was not an unreasonable application of clearly

17   established Supreme Court authority.  Accordingly, this claim should be denied.

18        *Claim 9*

19   Petitioner argues that he was denied his right to confrontation by the admission

20   into evidence of his co-defendant's statement that she had no knowledge of the offense for which

21   they were both suspects.

22   The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal

23   prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against

24   him[.]"  U.S. Const. amend. VI.  This right attaches to state court prosecutions through the

25   Fourteenth Amendment.  Pointer v. Texas, 380 U.S. 400, 403 (1965).  "The central concern of

26   the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant

1    by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of

2    fact." Maryland v. Craig, 497 U.S. 836, 845 (1990).  Confrontation Clause cases "fall into two

3    broad categories: cases involving the admission of out-of-court statements and cases involving

4    restrictions imposed by law or by the trial court on the scope of cross-examination."  Delaware v.

5    Fensterer, 474 U.S. 15, 18 (1985) (per curiam).  Petitioner's case is of the former variety, as the

6    essence of his claim is that the prosecution was allowed to introduce an alleged out-of-court

7    statement of an unavailable declarant.

8         The Confrontation Clause bars the admission of a hearsay statement made by a

9    declarant who is not available for cross-examination at trial unless that statement "bears adequate

10   'indicia of reliability.'"  Ohio v. Roberts, 448 U.S. 56, 66 (1980).[3]  Sutch was unavailable because

11   she exercised her Fifth Amendment privilege against self-incrimination.

12        There are two ways to meet the reliability requirement of the Confrontation

13   Clause.  First, "[r]eliability can be inferred without more in a case where the evidence falls

14   within a firmly rooted hearsay exception."  Id.  Second, if the evidence does not fall within a

15   firmly rooted exception, it may be admitted if there is a sufficient "showing of particularized

16   guarantees of trustworthiness" such that adversarial testing would be expected to add little, if

17   anything, to the statement's reliability.  Id.

18        Respondent contends that Sutch's statement was admitted as a declaration against

19   penal interest pursuant to Cal. Evid. Code § 1230.  In Lilly v. Virginia, 527 U.S. 116 (1999), the

20   Supreme Court held that, "accomplices' confessions that inculpate a criminal defendant are not

21

22   [3]  In Crawford v. Washington, 541 U.S. 36 (2004), the Supreme Court revised the test for
     determining the admissibility of hearsay statements.  In Whorton v. Bockting, 549 U.S. 406
     (2007), the Supreme Court held that Crawford announced a new rule of criminal procedure,

23   applicable only to cases not already final on direct review.  Here, petitioner's direct review
     became final on July 15, 2003.  Dkt. 13, Exhibit C.  See Caspari v. Bohlen, 510 U.S. 383, 390-91

24   (1994) ("A state conviction and sentence become final for purposes of retroactivity analysis when
     the availability of direct appeal to the state courts has been exhausted and the time for filing a

25   petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied.").
     Accordingly, because Crawford was decided after petitioner's direct review was final, it is not

26   applicable.

1  within a firmly rooted exception to the hearsay rule as that concept has been defined in our

2  Confrontation Clause jurisprudence."  527 U.S. at 134.

3          As for the second hearsay exception, there was no showing of a particularized

4  guarantee of trustworthiness regarding Sutch's statement.  Adversarial testing would clearly have

5  impacted the reliability of her statement.

6          Having found that admission of Sutch's statement violated the Confrontation

7  Clause, the undersigned must determine whether this error was harmless.  <u>Olden v. Kentucky</u>,

8  488 U.S. 227, 232 (1988) (per curiam)(Confrontation Clause violations are subject to harmless

9  error analysis).  Constitutional errors are harmless unless they have a "substantial and injurious

10 effect or influence in determining the jury's verdict."  <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637

11 (1993).

12         Admissions of Sutch's statement that she did not know how the Sudafed got in the

13 bucket and that she did not do it did not have a substantial and injurious effect on the jury's

14 verdict.  The jury heard credible and detailed testimony from the officer who witnessed petitioner

15 open the margarita bucket, put the Sudafed in it, cover the Sudafed with lentils and then put the

16 lid back on top.  The officer testified that he did not see Sutch put the Sudafed in the bucket or

17 touch the lentils.  Had Sutch's statement not been admitted, the outcome of the trial would have

18 been the same.

19         After conducting an independent review of the record, the undersigned finds that

20 the denial of this claim by the California Supreme Court was not an unreasonable application of

21 clearly established Supreme Court authority.  Accordingly, this claim should be denied.

22         *Claim 10*

23         Petitioner argues that his counsel was ineffective for failing to request that the

24 trial court instruct the jury that Sutch's prior inconsistent statement that she did not know

25 anything about how the Sudafed got in the bucket could *not* be considered for the truth of the

26 ////

1   matter asserted.  Petitioner further argues that counsel was ineffective for failing to object to the

2   misleading instruction regarding a witness' prior inconsistent statement.

3          Petitioner contends that the only basis for admission of Sutch's statement that she

4   did not know how the Sudafed got in the bucket was California Evidence Code § 1202 which

5   provides, in relevant part:

6          Evidence of a statement or other conduct by a declarant that is inconsistent with a
           statement by such declarant received in evidence as hearsay evidence is not
7          inadmissible for the purpose of attacking the credibility of the declarant though he
           is not given and has not had an opportunity to explain or to deny such inconsistent
8          statement or other conduct.

9   Cal. Evid. Code § 1202.

10         Petitioner argues that the only purpose for which § 1202 evidence can be

11  considered is to judge the credibility of a declarant.  Petitioner argues that his lawyer should have

12  asked for a jury instruction that would have informed the jury that it could only consider Sutch's

13  statement that she did not know anything about how the Sudafed got in the bucket for the

14  purposes of judging her credibility.  Petitioner argues that instead, defense counsel offered no

15  objection to the trial judge's misleading instruction that a witness's prior inconsistent out-of-

16  court statement could be considered for the purposes of impeachment *and* for the truth of the

17  matter asserted.  Petitioner contends that this instruction misled the jury because it was given

18  right after a separate instruction regarding Sutch, and because no prior inconsistent statements

19  other than Sutch's were offered into evidence.  Petitioner contends that as a result, the jury must

20  have believed that it could consider Sutch's claim of ignorance and innocence for the truth of the

21  matter asserted.

22         In the answer, respondent argues that although defense counsel could have sought

23  such a limiting instruction, his decision not to do so may have been based on a desire not to call

24  the jury's attention to this evidence.  Whether counsel had a strategic reason for not requesting

25  this instruction as a matter of strategy is speculative.  However, because it is clear that petitioner

26  ////

27

1   was not prejudiced by the failure to request this instruction, the instant ineffective assistance of

2   counsel claim is without merit.

3          Again, Sutch's initial statement that she was responsible for the stolen Sudafed

4   directly contradicted the clear, credible testimony of Deputy Jensen.  Had the jury received an

5   instruction that they could only consider Sutch's statement that she did not know how the

6   Sudafed got in the bucket as impeachment of her initial statement, and not for the truth of the

7   matter, it is extremely unlikely that the outcome of the trial would have been different.

8          After independently reviewing the record, the undersigned finds that the denial of

9   this claim by the California Supreme Court was not an unreasonable application of clearly

10  established Supreme Court authority.  Accordingly, this claim should be denied.

11         *Claim 11*

12         Petitioner argues that his appellate counsel was ineffective for failing to argue that

13  he was denied his right to confront witnesses against him by the introduction of Sutch's

14  statement that she did not know how the Sudafed got into the margarita bucket.

15         As set forth above in the discussion of claim 9, petitioner's claim alleging

16  violation of the Confrontation Clause is without merit.  Had appellate counsel raised this claim

17  on direct appeal, it almost certainly would have been denied.  Moreover, petitioner raised this

18  claim in a habeas corpus petition filed in the California Supreme Court which was denied on the

19  merits.  See Petitioner's Habeas Petition filed in the California Supreme Court lodged June 1,

20  2006.  The outcome would have been no different had this claim been raised on direct appeal.

21  Petitioner was not prejudiced by appellate counsel's failure to raise this claim.

22         After independently reviewing the record, the undersigned finds that the denial of

23  this claim by the California Supreme Court was not an unreasonable application of clearly

24  established Supreme Court authority.  Accordingly, this claim should be denied.

25  ////

26  ////

C.  Claims 12 and 13

Claims 12 and 13 concern the trial court's denial of his motion for substitute counsel.

*Legal Standard*

Denial of a motion pursuant to People v. Marsden, 2 Cal.3d 118 (1970), may implicate the Sixth Amendment right to counsel.  Schell v. Witek, 218 F.3d 1017, 1023 (9th Cir. 2000) (en banc). Therefore, when a criminal defendant makes a request for substitution of counsel, the trial court is constitutionally required to inquire into the defendant's reasons for wanting a new attorney.  Schell, 218 F.3d at 1025 ("[I]t is well established and clear that the Sixth Amendment requires on the record an appropriate inquiry into the grounds for such a motion, and that the matter be resolved on the merits before the case goes forward."); see also Stenson v. Lambert, 504 F.3d 873, 886 (9th Cir. 2007) ("A trial court's inquiry regarding counsel's performance on a motion to substitute counsel should be such necessary inquiry as might ease the defendant's dissatisfaction, distrust and concern.") (citation and internal quotation marks omitted).  For an indigent defendant, such an inquiry can serve to protect against constitutional injury because the failure to provide substituted counsel "may result in a denial of the constitutional right to effective assistance of counsel if the defendant and his attorney are embroiled in an 'irreconcilable conflict.'"  United States v. Mills, 597 F.2d 693, 700 (9th Cir. 1979) (internal citations omitted).

In reviewing a federal habeas claim based on the denial of a substitution motion, "the ultimate constitutional question the federal courts must answer" is whether the state trial court's disposition of the motion violated a petitioner's constitutional rights because the conflict between the petitioner and appointed counsel "had become so great that it resulted in a total lack of communication or other significant impediment that resulted in turn in an attorney-client relationship that fell short of that required by the Sixth Amendment." Schell, 218 F.3d at 1026. If the reviewing court determines that a conflict developed between the petitioner and appointed

1  counsel so serious that it "resulted in the constructive denial of assistance of counsel, no further

2  showing of prejudice is required." Schell, 218 F.3d at 1027-28 (citing Strickland, 466 U.S. at

3  692).  On the other hand, "not every conflict or disagreement between the defendant and counsel

4  implicates Sixth Amendment rights." Schell, 218 F.3d at 1027 (citing Morris v. Slappy,

5  461 U.S. 1, 13-14 (1983) (holding that the Sixth Amendment does not guarantee a "meaningful

6  relationship" between defendant and counsel)); see also Stenson, 504 F.3d at 886 ("An

7  irreconcilable conflict in violation of the Sixth Amendment occurs only where there is a

8  complete breakdown in communication between the attorney and client, and the breakdown

9  prevents effective assistance of counsel.  Disagreements over strategic or tactical decisions do not

10  rise to [the] level of a complete breakdown in communication.")

11        As explained by the Ninth Circuit:

12  > The test for determining whether the trial judge should have granted a substitution
   > motion is the same as the test for determining whether an irreconcilable conflict
13  > existed. The court must consider: (1) the extent of the conflict; (2) whether the
   > trial judge made an appropriate inquiry into the extent of the conflict; and (3) the
14  > timeliness of the motion to substitute counsel.

15  Daniels v. Woodford, 428 F.3d 1181, 1197-98 (9th Cir. 2005) (citations omitted).

16        A trial judge must also order a substitution of counsel if, after a hearing, the

17  defendant demonstrates the existence of "an actual conflict of interest." Jackson v. Ylst,

18  921 F.2d 882, 888 (1990).

19        *Background*

20        On February 14, 2001, trial counsel filed a motion to withdraw as petitioner's

21  counsel.  (CT at 111-18.)  The grounds for this motion were that the day before, on February 13,

22  2001, trial counsel became aware that the Public Defender's Office, for whom he worked, was

23  concurrently representing defendant's former wife in a Child Protective Services ("CPS") action.

24  (CT at 111.)  Trial counsel was employed as a contract attorney by the Public Defender's office.

25  (RT at 60.)  Petitioner had asked trial counsel to have no contact with any other lawyer within the

26  Public Defender's Office relative to his criminal case, as the attorney representing his former

1   wife was attempting to gain custody of the children.  (CT at 112.)   Petitioner was apparently

2   concerned that information regarding the criminal case could be used against him in the CPS

3   action in which he was represented by private counsel.  (RT at 35.)

4            In the motion to withdraw, trial counsel also stated that Sandra Leggio, the deputy

5   public defender representing petitioner's former wife, had asked trial counsel about his

6   representation of petitioner.  (CT at 112.)  Trial counsel told her that he represented petitioner in

7   a criminal action, but gave her no other information.  (CT at 112.)  Trial counsel stated that

8   petitioner felt that this communication was in direct contravention of his instructions to have no

9   contact with any other lawyer from the Public Defender's Office regarding his criminal case and

10  had created a conflict.  (CT at 112.)

11           At the hearing on the motion to withdraw, trial counsel told the court that he was

12  "concerned about the inevitable contact that took place between that attorney across the street

13  and myself as creating a problem with even the appearance of impropriety relative to my

14  representation of Mr. Benjamin..."  (RT at 32.)  Trial counsel also told the court that he was the

15  appellate attorney for the Public Defender's office.  (RT at 33.)  If petitioner's former wife lost

16  her case, i.e., her parental rights were terminated, it would be trial counsel's job to file an appeal

17  on her behalf.  (RT at 33-34.)  In the CPS case, petitioner was represented by private counsel.

18  (RT at 35.)

19           The trial judge denied the motion to withdraw based upon finding no evidence of

20  an actual conflict.  (RT at 37.)  The trial judge noted that if an appeal needed to be filed on behalf

21  of petitioner's former wife, another lawyer could be appointed to do the appeal.  (RT at 38.)   The

22  trial judge also found that petitioner should have brought the issue up much sooner, in effect

23  finding the request untimely.  (RT at 37-38.)

24           Immediately after the denial of the motion to withdraw, petitioner made a

25  Marsden motion requesting substitute counsel.  At the hearing on this motion, petitioner gave

26  several reasons for wanting new counsel.  Petitioner said that at the previous hearing it seemed

like counsel and his investigator were trying to talk him into taking a deal when he had told them that he did not want to.  (RT at 41.)   Petitioner stated that trial counsel told him that a tape from Winco existed showing what he did.  (RT at 49.)  Trial counsel told him that when he got the tape, they would have another meeting.  (RT at 49.)  It turned out that the tape could not be found.  (RT at 51.)  Petitioner also complained that he had tried to get into trial counsel's office to talk to him but could not.  (RT at 48-49.)  Petitioner had met with trial counsel two to three times in his office but the majority of his contacts with counsel were in the courtroom.  (RT at 56.)

Petitioner next told the trial court that the previous day he had told his counsel not to tell anyone at the Public Defender's office that he (petitioner) had a CPS case.  (RT at 42.) The CPS case had ended the previous day.  (RT at 43.)  Right after this conversation, petitioner saw his counsel talking to Ms. Leggio, a lawyer with the Public Defender's office.  (Id.) Petitioner stated that trial counsel allegedly told Ms. Leggio that petitioner had a criminal proceeding across the street and "we need to talk."  (Id.)  Petitioner stated that this made him unable to trust trial counsel.  (Id. at 43.)  Trial counsel later told petitioner that, by law, he was required to tell Ms. Leggio that he was representing petitioner.  (Id.)

Trial counsel went on to explain that both he and Ms. Leggio worked for the Public Defender's office.  (RT at 57.)  Trial counsel was employed as a contract attorney by the Public Defender's office.  (RT at 60.)  When Ms. Leggio approached trial counsel the previous day, she assumed that he had been privately retained.  (Id.)  It turned out that trial counsel represented petitioner through a contract with the Public Defender's office.  (Id.)  Ms. Leggio represented petitioner's former wife in a CPS case.  (RT at 58.)  In that case, petitioner was trying to regain custody of his son.  (RT at 44.)   Trial counsel told Ms. Leggio that he represented petitioner in a criminal matter.  (RT at 61.)  He gave her no other information about the case. (Id.)  Trial counsel was concerned that the Public Defender's office had a conflict by Ms. Leggio's representation of petitioner's former wife and his representation of petitioner.  (RT

1    at 61-62.)  Up until that time, the juvenile court where the CPS proceedings were occurring was

2    unaware that petitioner had felony charges pending.  (RT at 59.)

3            Trial counsel told the court that he believed that a breakdown in his relationship

4    with petitioner had occurred based on his conversation with Ms. Leggio and her representation of

5    petitioner's former wife.  (RT at 57-58.)  Trial counsel stated that it was "hard to say that

6    [petitioner] doesn't have a basis wrong or right for feeling that way."  (RT at 58.)

7            Toward the end of the hearing petitioner made the following comments regarding

8    counsel's communication with Ms. Leggio:

> Yeah.  I'll just say one more thing that, you know, I just asked him not to say
> anything.  I didn't tell him not to talk to anyone.  I said don't tell anyone about my
> case across the street.  How can I give my full trust to an attorney that I just said
> don't say nothing when there is no law saying that he had to say anything?  He
> could have walked away and not said nothing.  He did what I asked him not to do
> as soon as I got it out of my mouth and says, bam, he's got a case across the street.
> Exactly what I asked him not to do.
>
> How can I get a fair shake at trial when that happens?  I don't trust him.  I think
> he's a fine attorney.  I do.  And he's done his job and he's proven he's doing his
> job here.  How can I – do you see my point of view?  How can I feel like, you
> know, you see – if you want me to be quiet I will.

16   (RT at 62-63.)

17           Petitioner went on to tell the court that he did not think the Public Defender's

18   officer or trial counsel was prejudiced against him.  (RT at 64.)

19           The trial court denied petitioner's motion for substitute counsel finding that trial

20   counsel had properly investigated the case and that he made no attempt to mislead petitioner or

21   coerce him to plead guilty.  (RT at 65.)  The trial court further found no breakdown in the

22   relationship between petitioner and trial counsel.  (Id.)  The fact that petitioner had

23   unsuccessfully tried to schedule a couple of meetings did not create a breakdown in the

24   relationship.  (RT at 66.)  In addition, the trial court found that petitioner could have told trial

25   counsel much sooner that his wife was represented by someone from the Public Defender's

26   office.  (Id.)  The trial court stated that petitioner put trial counsel on the spot the previous day

1   and it worked no injustice or bad result for petitioner.  (Id.)  Trial counsel had relayed the

2   information that he was representing petitioner to Ms. Leggio "who essentially did nothing with

3   it."  (RT at 59.)

4                                    *Analysis of Claim 12*

5            In claim 12, petitioner alleges that he was denied his Sixth Amendment right of

6   counsel by the trial court's failure to grant his motion for substitute counsel.

7            The trial judge made an appropriate inquiry into petitioner's claims of conflict.

8   The trial judge's finding that trial counsel's communications with petitioner regarding the Winco

9   tape and pleading guilty did not result in complete breakdown in communication was supported

10  by the record.  The record did not show that trial counsel improperly tried to coerce petitioner

11  into pleading guilty or misrepresented the evidence.  In addition, the trial judge's finding that

12  petitioner's claims of inadequate contact with counsel did not cause a complete breakdown in

13  communication was well supported.

14           Petitioner's claim that he had a conflict with counsel based on the Public

15  Defender's office simultaneous representation of his former wife in the CPS case suggested an

16  actual conflict.  As stated above, a trial judge must order a substitution of counsel if, after a

17  hearing, the defendant demonstrates the existence of "an actual conflict of interest."  Jackson v.

18  Ylst, 921 F.2d at 888.

19           To establish an actual conflict of interest, the petitioner must show that his

20  interests "diverge[d] with respect to a material factual or legal issue or to a course of action."

21  Cuyler v. Sullivan, 446 U.S. 335, 356 n. 3 (1980) (Marshall, J., concurring in part and dissenting

22  in part).  Additionally, the petitioner must establish that the actual conflict adversely affected his

23  counsel's performance.  Id. at 348.  The adverse performance prong is met if the attorney took

24  action on behalf of one client that was necessarily adverse to the defense of the other or failed to

25  take action on behalf of one because it would adversely affect the other.  See United States v.

26  Tatum, 943 F.2d 370, 376 (4th Cir. 1991).  If the petitioner makes these showings, prejudice is

34

1  presumed and he is entitled to habeas relief.  See Cuyler, 446 U.S. at 349-50.  The question of

2  whether counsel labored under an actual conflict of interest that affected counsel's performance is

3  a mixed question of law and fact that we review de novo.  Id. at 342.

4          In the instant case, petitioner's counsel told Ms. Leggio, the lawyer representing

5  petitioner's former wife in the CPS action, that he represented petitioner in a criminal case.  This

6  information could have adversely affected petitioner's CPS action – not his *criminal* action.  In

7  any event, Ms. Leggio did nothing with this information.  In addition, there is no showing in the

8  record that counsel's representation of petitioner was impacted in any way by the Public

9  Defender's office simultaneous representation of petitioner's former wife in the CPS case.  In

10  other words, there was no defense strategy or tactic that counsel abandoned as a result of the

11  conflict.  See United States v. Shwayder, 312 F.3d 1109, 1118 (9th Cir. 2002) (alternatively

12  describing the standard as requiring "that counsel was influenced in his basic strategic decisions"

13  by the conflict (internal quotation marks omitted)).  Therefore, assuming counsel had a conflict

14  of interest based on the Public Defender's office simultaneous representation of petitioner's

15  former wife, petitioner has not demonstrated that the conflict adversely affected trial counsel's

16  performance.

17          Petitioner is also alleging that counsel's communication with Ms. Leggio caused

18  him to be unable to trust trial counsel, creating a breakdown in their relationship.  "Where a

19  criminal defendant has, with legitimate reason, completely lost trust in his attorney, and the trial

20  court refuses to remove the attorney, the defendant is constructively denied counsel."  Daniels v.

21  Woodford, 428 F.3d 1181, 1197 (9th Cir. 2005).  "Even if [trial] counsel is competent, a serious

22  breakdown in communications can result in an inadequate defense."  U.S. v. Nguyen, 262 F.3d

23  998, 1003 (9th Cir. 2001) (citing United States v. Musa, 220 F.3d 1096, 1102 (9th Cir. 2000));

24  see also United States v. D'Amore, 56 F.3d 1202, 1206 (9th Cir. 1995) ("[A] court may not deny

25  a substitution motion simply because [it] thinks current counsel's representation is adequate."),

26  overruled on other grounds by United States v. Garrett, 179 F.3d 1143 (9th Cir. 1999).

By finding that petitioner himself was at fault for putting counsel on the spot when he was approached by Ms. Leggio, the trial judge in essence found that petitioner did not have a legitimate reason not to trust trial counsel.  While the record does not indicate when precisely petitioner became aware that his wife was represented by the public defender's office, petitioner told the court that the hearing the previous day had been a one-year review.  (RT at 44.)  It is not unreasonable to infer that petitioner knew well before that day that his former wife was represented by the Public Defender's office as the CPS proceedings were apparently ongoing.  By waiting until the day of the hearing to provide counsel with this information, petitioner placed counsel in the position of having to respond to Ms. Leggio's inquiries regarding his representation of petitioner.

In addition, counsel acted appropriately during his conversation with Ms. Leggio.  Ms. Leggio approached counsel and asked him about his relationship with petitioner.  It would have been very difficult for counsel just to "walk away," as suggested by petitioner.  In response, trial counsel merely informed Ms. Leggio that he represented petitioner in a criminal case.  He did not discuss the nature of the charges.

Because petitioner himself caused trial counsel to be placed in the position of having to discuss his representation of petitioner with Ms. Leggio, and trial counsel then conducted himself appropriately during that conversation, petitioner's claim that he could no longer trust counsel was not legitimate.  Moreover, petitioner also told the trial court during the Marsden hearing that he did not think that counsel was prejudiced against him and that counsel had done a good job.  Petitioner's alleged mistrust did not cause a complete breakdown in the attorney-client relationship.  Under these circumstances, the trial court properly denied petitioner's motion for substitute counsel.

After independently reviewing the record, the undersigned finds that the denial of this claim by the California Supreme Court was not an unreasonable application of clearly established Supreme Court authority.  Accordingly, this claim should be denied.

*Claim 13*

In claim 13, petitioner alleges that appellate counsel was ineffective for failing to raise the claim concerning the trial court's denial of his motion for substitute counsel on direct appeal. Because this claim is without merit, petitioner was not prejudiced by appellate counsel's failure to raise this claim. In addition, petitioner raised this claim in his habeas petition that was filed in the California Supreme Court. The California Supreme Court denied this claim on the merits. There is nothing in the record suggesting that the outcome would have been different had petitioner raised this claim on direct appeal.

After independently reviewing the record, the undersigned finds that the denial of this claim by the California Supreme Court was not an unreasonable application of clearly established Supreme Court authority. Accordingly, this claim should be denied.

D. Claims 14-16

In claim 14, petitioner alleges that imposition of the upper term sentence for his conviction for violating Cal. Health & Saf. Code § 11383(c)(1) violated the Sixth Amendment. In particular, petitioner argues that imposition of the upper term violated Apprendi v. New Jersey, 530 U.S. 466 (2000), and Blakely v. Washington, 542 U.S. 296 (2004). In claim 15, petitioner argues that his trial counsel was ineffective for failing to argue that imposition of the upper term violated the Sixth Amendment. In claim 16, petitioner argues that his appellate counsel was ineffective for failing to argue that imposition of the upper term violated the Sixth Amendment.

If the undersigned was to find that the imposition of petitioner's upper term violated the Sixth Amendment, the appropriate relief would be for petitioner to be resentenced. However, petitioner has since been discharged from parole. The undersigned cannot order the relief sought in connection with claims 14-16.

In the context of habeas petitions, the case or controversy requirement warrants a finding of mootness if: (1) the petitioner has received the relief requested in the petition; or

(2) the court is unable to provide the petitioner with the relief sought.  See Munoz v. Rowland, 104 F.3d 1096, 1097-98 (9th Cir. 1997); Picrin-Peron v. Rison, 930 F.2d 773, 775-76 (9th Cir. 1991).  Petitioner's claims alleging that imposition of the upper term violated the Sixth Amendment are moot because the court is unable to provide petitioner the relief sought in connection with these claims.  Accordingly, claims 14-16 should be denied as moot.

E. Claim 17

Petitioner argues that his counsel was ineffective for failing to request the sanitation of the record of a prior conviction or a limiting instruction concerning the use of the prior conviction.  The California Court of Appeal denied this claim for the reasons stated herein:

A. Handling of Prior Conviction for Manufacturing

Defendant contends his attorney was ineffective in failing to seek redaction of the underlying facts of his prior conviction. We do not agree.

At trial, after the court stated that evidence related to defendant's prior conviction would be admissible, the prosecution stated that, rather than having witnesses testify about defendant's prior offense, it would simply introduce the packet containing the certified copy of conviction. The prosecution showed this multipage document to defense counsel, who stated he had no objection to its introduction.

During final argument, however, it became clear that defendant thought only the fact of defendant's conviction would be admitted, not the underlying facts surrounding the offense. The court noted that the packet included a factual basis for the conviction, and stated that it had understood the prosecution's motion as relating to admissibility of the entire packet, not simply the fact of defendant's conviction. The court therefore permitted the prosecution to describe defendant's prior offense in closing argument. The court reaffirmed this ruling in denying defendant's motions for mistrial and new trial.

Defendant now asserts that his attorney was ineffective in failing to seek redaction of the packet to eliminate the description of defendant's manufacturing effort.

The People respond that this decision was a matter of trial tactics. The record indicates otherwise. Discussions during closing argument indicate that defense counsel erroneously believed that none of the underlying facts relating to the conviction had been admitted into evidence. Given this misperception, the failure to seek redaction cannot be deemed a matter of tactics. Counsel's failure to seek redaction was not a conscious choice but instead resulted from the mistaken belief that this information had already been excluded.

////

Although counsel's failure to seek redaction was not a matter of trial tactics, neither is it evidence of ineffective assistance of counsel. As discussed at length above, the trial court ruled defendant's prior conviction for manufacturing methamphetamine to be admissible under sections 1101 and 352. The prosecution was entitled to introduce evidence of that offense to demonstrate defendant's intent. Nothing in the record suggests that the trial court would have limited that evidence to the stark fact of conviction, and not permitted the prosecution to introduce evidence relating to that offense. Unlike People v. Guizar (1986) 180 Cal.App.3d 487, 491-492, the probative value of the other crimes evidence was high and outweighed any prejudicial effect. Counsel cannot be deemed ineffective for failing to seek redaction of admissible material. (See People v. Osband (1996) 13 Cal.4th 622, 678.)  "A defense counsel is not required to make futile motions or to indulge in idle acts to appear competent." (People v. Torres (1995) 31 Cal.App.4th 1084, 1091.)

Defendant contends his attorney should have requested an instruction to limit the applicability of the prior conviction. The trial court instructed the jury pursuant to CALJIC No. 2.50 that defendant's prior conviction could be considered "for the limited purpose of determining if it tends to show the existence of the intent which is a necessary element of the crime charged [¶] or [a] motive for the commission of the crime charged." Defendant contends his attorney should have requested that this instruction be limited to specify that the prior conviction was relevant only on the question of intent for the possession charge and was irrelevant to the petty theft charge.

The failure to give a limiting instruction may well have been a matter of trial tactics, because the proposed instruction could have called unwanted attention to the similarities between the prior conviction and the current charge. (See People v. Hawkins (1995) 10 Cal.4th 920, 942, overruled on other grounds in People v. Blakeley (2000) 23 Cal.4th 82, 89; People v. Johnson (1993) 6 Cal.4th 1, 49, 50.) A tactical decision cannot form the basis for a claim of ineffective assistance of counsel.

In any event, any error in failing to request such an instruction was harmless. The prior manufacturing conviction was relevant to establish defendant's intent in possessing Sudafed, and that was the focus of the prosecutor's arguments to the jury. The prior was dissimilar to, and had no bearing on, the petty theft charge, and it is unreasonable to think the jury somehow improperly utilized the prior conviction to establish the requisite intent for petty theft, i.e., that defendant took the property with the specific intent to permanently deprive the owner of that property. (See CALJIC No. 14.41.) Counsel's failure to seek a limiting instruction does not constitute ineffective assistance of counsel.

Dkt. 13, Exhibit 13, pp. 7-11.

For the reasons stated by the California Court of Appeal, this claim of ineffective assistance of counsel is without merit.  The denial of this claim by the California Court of Appeal

////

39

1   was not an unreasonable application of clearly established Supreme Court authority.

2   Accordingly, this claim should be denied.

3           F.  <u>Claim 18</u>

4           Petitioner alleges that trial counsel was ineffective for failing to request an

5   eyewitness identification instruction. The California Court of Appeal denied this claim for the

6   reasons stated herein:

7
8         Defendant contends that, because so much of the prosecution's case depended on the observations of the store security guard, his attorney should have requested CALJIC Nos. 2.91 ("Burden of Proving Identity Based Solely on Eyewitnesses")
9         and 2.92 ("Factors to Consider in Proving Identity by Eyewitness Testimony"). He asserts that the failure to request these instructions constituted ineffective assistance of counsel.
10

11         Even if we assume for purposes of argument that these instructions would have been appropriate, the failure to request them was not prejudicial. The court gave
12         other instructions relating to the assessment of witness credibility, including CALJIC Nos. 2.20 ("Believability of Witness"), 2.21.1 ("Discrepancies in Testimony"), 2.22 ("Weighing Conflicting Testimony"), 2.27 ("Sufficiency of
13         Testimony of One Witness") and 2.90 ("Presumption of Innocence-Reasonable Doubt-Burden of Proof"). These instructions are "sufficient to inform the jury that
14         the prosecution had the burden of establishing identity, and that defendant should be acquitted in the event the jury harbored a reasonable doubt on the issue of
15         identity." (<u>People v. Alcala</u> (1992) 4 Cal.4th 742, 803.)

16         Thus, even if counsel should have requested CALJIC Nos. 2.91 and 2.92, the failure to do so was not prejudicial, and defendant's claim of ineffective assistance
17         of counsel necessarily fails.

18   Dkt. No. 13, Exhibit A, pp. 11-12.

19           For the reasons stated by the California Court of Appeal, this claim of ineffective

20   assistance of counsel is without merit.  The denial of this claim by the California Court of Appeal

21   was not an unreasonable application of clearly established Supreme Court authority.

22   Accordingly, this claim should be denied.

23           G.  <u>Claim 19</u>

24           Petitioner alleges that the trial court erred in failing to instruct sua sponte on the

25   law of accomplices.

26   ////

1        *Legal Standard*

2        A challenge to jury instructions does not generally state a federal constitutional

3   claim.  See Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983); see also Middleton v.

4   Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985).  Habeas corpus relief is unavailable for alleged error

5   in the interpretation or application of state law.  Estelle v. McGuire, 502 U.S. 62 (1981); see also

6   Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright, 786 F.2d 1378, 1381

7   (9th Cir. 1986).  The standard of review for a federal habeas court "is limited to deciding whether

8   a conviction violated the Constitution, laws, or treaties of the United States (citations omitted)."

9   Estelle v. McGuire, 502 U.S. at 68.  In order for error in the state trial proceedings to reach the

10  level of a due process violation, the error had to be one involving "fundamental fairness."  Id. at

11  73.  The Supreme Court has defined the category of infractions that violate fundamental fairness

12  very narrowly.  Id.

13       When what is at issue is the failure to give an instruction, petitioner's burden is

14  "especially heavy" because it has been held that "[a]n omission or an incomplete instruction is

15  less likely to be prejudicial than a misstatement of the law."  Henderson v. Kibbe, 431 U.S. 145,

16  155 (1977).  Moreover, a trial judge need not instruct on a defense which would be inconsistent

17  with petitioner's theory of the case.  Bashor v. Risley, 730 F.2d 1228, 1240 (9th Cir. 1984).

18  Failure to give a jury instruction under these circumstances will not amount to a due process

19  violation.  Id.

20       The burden upon petitioner is greater yet in a situation where he claims that the

21  trial court did not give an instruction sua sponte.  To the extent that petitioner rests his claim on a

22  duty to give an instruction sua sponte under rules of state law, petitioner has stated no federal

23  claim.  Indeed, in the failure to give a lesser included offense instruction context, the Ninth

24  Circuit has held in non-capital cases that the failure to give the instruction states no federal claim

25  whatsoever.  James v. Reece, 546 F.2d 325, 327 (9th Cir. 1976).  Therefore, in order to violate

26  ////

due process, the impact on the proceeding from failure to give an instruction sua sponte must be of a very substantial magnitude.

Furthermore, the Supreme Court has held that there is no unreasonable application of federal law where a state appellate court decided that a jury instruction's single incorrect statement of the "imperfect self-defense" standard did not render the instruction reasonably likely to have misled the jury. Middleton v. McNeil, 541 U.S. 433 (2004).

*Analysis*

The California Court of Appeal denied this claim for the reasons stated herein:

Defendant contends the trial court had a sua sponte obligation to instruct on the definition of an "accomplice" (CALJIC No. 3.10), to instruct that Andrea Sutch was an accomplice as a matter of law (CALJIC No. 3.16), and to instruct that the incriminating statements of an accomplice should be viewed with caution (CALJIC No. 3.18). Defendant contends the court's failure to give these instructions compels reversal. Again, we disagree.

Two points made by the People warrant comment. First, citing People v. Williams (1988) 45 Cal.3d 1268, 1314, the People contend that, because Sutch's statements were both favorable and unfavorable to defendant, the court had no sua sponte duty to give CALJIC No. 3.18. However, in People v. Guiuan (1998) 18 Cal.4th 558, 569, the Supreme Court concluded that this instruction should be modified to apply only to testimony that tends to incriminate the defendant, and CALJIC No. 3.18 was revised accordingly. The People's claim is predicated on outdated law.

Second, the People assert these instructions are inapplicable because Sutch was not a witness and did not actually testify at trial. Instead, a police officer recounted Sutch's out-of-court claim that she had no idea how the Sudafed got into the margarita mix pail, a claim that implicated defendant. The California Supreme Court has explained that Penal Code section 1111 and CALJIC No. 3.11 ("Testimony of Accomplice Must Be Corroborated") apply with equal force when an accomplice's out-of-court statements are used as substantive evidence of a defendant's guilt. (See, e.g., People v.. Andrews (1989) 49 Cal.3d 200, 214; People v. Belton (1979) 23 Cal.3d 516, 524-526.) While defendant does not include CALJIC No. 3 .11 in his litany of wrongfully omitted instructions, the same analysis applies. The fact that Sutch did not testify in person has no bearing on the question of whether the court erred in failing to advise the jury that accomplice testimony should be viewed with caution. The principles behind the instruction are the same, regardless of whether the accomplice testifies at trial or through the admission of an out-of-court statement.

That said, the omission of CALJIC No. 3.18, "even if erroneous, is deemed harmless where there was ample evidence corroborating the witness's testimony." (People v. Arias (1996) 13 Cal.4th 92, 143.) Corroboration may be slight and

42

entitled to little consideration when standing alone. Although this evidence must relate to some element of the crime, it need not be sufficient in itself to establish every element of the charged offense. (People v. Zapien (1993) 4 Cal.4th 929, 982.)

Here, ample corroborating evidence was provided. The security guard described defendant as the person who placed the Sudafed in the margarita mix pail. A police officer described how Sudafed is used to manufacture methamphetamine. The prosecution introduced evidence that defendant had previously been convicted of manufacturing methamphetamine, which was relevant to establishing defendant's intent on this occasion. We note too, that Sutch's credibility and trustworthiness were vigorously challenged by defendant and the trial court instructed the jury that bias may be considered in assessing witness credibility. (CALJIC No. 2.20.)

Under these circumstances, the failure to give the cited accomplice instructions was harmless under either People v. Watson (1956) 46 Cal.2d 818, 836, or Chapman v. California (1967) 386 U.S. 18, 24.

Defendant contends that, while that may be the case under California law, the omission of these instructions implicates federal constitutional rights. He argues that the failure to give these accomplice instructions is a structural defect that lessens the prosecutor's burden of proof and is thus reversible per se. We do not agree. The prosecutor's burden of proof was clearly explained to the jury, and the absence of CALJIC No. 3.18 did not lessen that burden in any way, or otherwise violate due process. (See People v. Frye (1998) 18 Cal.4th 894, 966; People v. Arias, supra, 13 Cal.4th at p. 143.)

Dkt. No. 13, Exhibit 1, pp. 12-15.

For the reasons stated by the California Court of Appeal, the trial court's failure to sua sponte instruct on accomplice testimony did not violate fundamental fairness.  The denial of this claim by the California Court of Appeal was not an unreasonable application of clearly established Supreme Court authority.  Accordingly, this claim should be denied.

H.  Claim 20

In claim 20, petitioner argues that his conviction should be reversed based on cumulative error.

The Supreme Court has clearly established that the combined effect of multiple trial court errors violates due process where it renders the resulting criminal trial fundamentally unfair."  Parle v. Runnels, 505 F.3d 922, 927 (9th Cir. 2007), citing Chambers v. Mississippi,

1    410 U.S. 284, 298, 302-03 (1973) (combined effect of individual errors "denied [Chambers] a

2    trial in accord with traditional and fundamental standards of due process" and "deprived

3    Chambers of a fair trial").  "The cumulative effect of multiple errors can violate due process even

4    where no single error rises to the level of a constitutional violation or would independently

5    warrant reversal." Id., citing Chambers, 410 U.S. at 290 n. 3.

6            "Under traditional due process principles, cumulative error warrants habeas relief

7    only where the errors have 'so infected the trial with unfairness as to make the resulting

8    conviction a denial of due process.'" Id., quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643

9    (1974).  "Such 'infection' occurs where the combined effect of the errors had a 'substantial and

10   injurious effect or influence on the jury's verdict.'" Id., quoting Brecht v. Abrahamson, 507 U.S.

11   619, 637 (1993) (internal quotations omitted).  "In simpler terms, where the combined effect of

12   individually harmless errors renders a criminal defense 'far less persuasive than it might

13   [otherwise] have been,' the resulting conviction violates due process." Id., citing Chambers,

14   410 U.S. at 294.

15           As discussed above, the undersigned has found no errors of constitutional

16   magnitude.  For that reason, petitioner's claim of cumulative error should be denied.  After an

17   independent review of the record, the undersigned finds that the denial of this claim by the

18   California Supreme Court was not an unreasonable application of clearly established Supreme

19   Court authority.

20           Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for

21   a writ of habeas corpus be denied.

22           If petitioner files objections, he shall also address if a certificate of appealability

23   should issue and, if so, as to which issues.  A certificate of appealability may issue under

24   28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a

25   constitutional right." 28 U.S.C. § 2253(c)(2).  The certificate of appealability must "indicate

26   which specific issue or issues satisfy" the requirement.  28 U.S.C. § 2253(c)(3).

1    These findings and recommendations are submitted to the United States District

2    Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen

3    days after being served with these findings and recommendations, any party may file written

4    objections with the court and serve a copy on all parties.  Such a document should be captioned

5    "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

6    objections shall be filed and served within fourteen days after service of the objections.  The

7    parties are advised that failure to file objections within the specified time may waive the right to

8    appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

9    DATED:  July 22, 2010

10

11

12   _____
     KENDALL J. NEWMAN
13   UNITED STATES MAGISTRATE JUDGE

benjamin.hab

14

15

16

17

18

19

20

21

22

23

24

25

26