IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DANIEL PATRICK BENJAMIN,

             Petitioner,                 No. 2:03-cv-1166 FCD KJN P

   vs.

KATHLEEN PROSPER, et al.,

             Respondents.         <u>AMENDED</u>
                                           <u>FINDINGS AND RECOMMENDATIONS</u>

——————————————————/

I.    <u>Introduction</u>

        Petitioner is a former state prisoner proceeding through counsel with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2001 conviction for petty theft with a prior (Cal. Penal Code §§ 666, 484) and possession of ephedrine and/or pseudoephedrine with the intent to manufacture methamphetamine (Cal. Health & Saf. Code § 11383 (c)(1)).  Petitioner was sentenced to twelve years in state prison.

        When petitioner filed this action, he was incarcerated in state prison.  Since that time, petitioner has been released from prison and is no longer on parole.  To the extent petitioner's claims challenge the validity of his conviction, his claims are not moot.

////

////

1          This action is proceeding on the third amended petition filed March 22, 2006,

2    raising twenty claims (Dkt. No. 39).  On May 22, 2006, respondent filed an answer (Dkt. No.

3    40).  On July 21, 2006, petitioner filed a traverse (Dkt. No. 44).  On July 23, 2010, the

4    undersigned filed Findings and Recommendations (Dkt. No. 49).  After granting petitioner an

5    extension of time, on September 3, 2010, he filed objections to those Findings and

6    Recommendations (Dkt No. 53) and on September 17, 2010, respondent filed a response to the

7    objections (Dkt. No. 54).

8          After carefully considering the record, the undersigned issues these amended

9    findings and recommendations and recommends that the petition be denied.

10   II.    Anti-Terrorism and Effective Death Penalty Act ("AEDPA")

11         In Williams (Terry) v. Taylor, 529 U.S. 362 (2000), the Supreme Court defined

12   the operative review standard in a habeas corpus action brought pursuant to 28 U.S.C. § 2254.

13   Justice O'Connor's opinion for Section II of the opinion constitutes the majority opinion of the

14   court.  There is a dichotomy between "contrary to" clearly established law as enunciated by the

15   Supreme Court, and an "unreasonable application of'" that law.  Id. at 405.  "Contrary to" clearly

16   established law applies to two situations:  (1) where the state court legal conclusion is opposite

17   that of the Supreme Court on a point of law; or (2) if the state court case is materially

18   indistinguishable from a Supreme Court case, i.e., on point factually, yet the legal result is

19   opposite.

20         "Unreasonable application" of established law, on the other hand, applies to

21   mixed questions of law and fact, that is the application of law to fact where there are no factually

22   on point Supreme Court cases which mandate the result for the precise factual scenario at issue.

23   Id. at 407-08.  It is this prong of the AEDPA standard of review which directs deference be paid

24   to state court decisions.  While the deference is not blindly automatic, "the most important point

25   is that an *unreasonable* application of federal law is different from an incorrect application of

26   law....[A] federal habeas court may not issue the writ simply because that court concludes in its

1  independent judgment that the relevant state-court decision applied clearly established federal

2  law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 410-

3  11 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the

4  objectively unreasonable nature of the state court decision in light of controlling Supreme Court

5  authority.  Woodford v. Viscotti, 537 U.S. 19 (2002).

6          "Clearly established" law is law that has been "squarely addressed" by the United

7  States Supreme Court.  Wright v. Van Patten, 552 U.S. 120 (2008).  Thus, extrapolations of

8  settled law to unique situations will not qualify as clearly established.  See e.g., Carey v.

9  Musladin, 549 U.S. 70, 76 (2006) (established law not permitting state sponsored practices to

10  inject bias into a criminal proceeding by compelling a defendant to wear prison clothing or by

11  unnecessary showing of uniformed guards does not qualify as clearly established law when

12  spectators' conduct is the alleged cause of bias injection).

13          The state courts need not have cited to federal authority, or even have indicated

14  awareness of federal authority, in arriving at their decision.  Early v. Packer, 537 U.S. 3 (2002).

15  Nevertheless, the state decision cannot be rejected unless the decision itself is contrary to, or an

16  unreasonable application of, established Supreme Court authority.  Id.  An unreasonable error is

17  one in excess of even a reviewing court's perception that "clear error" has occurred.  Lockyer v.

18  Andrade, 538 U.S. 63, 75-76 (2003).  Moreover, the established Supreme Court authority

19  reviewed must be a pronouncement on constitutional principles, or other controlling federal law,

20  as opposed to a pronouncement of statutes or rules binding only on federal courts.  Early v.

21  Packer, 537 U.S. at 9.

22          However, where the state courts have not addressed the constitutional issue in

23  dispute in any reasoned opinion, the federal court will independently review the record in

24  adjudication of that issue.  "Independent review of the record is not de novo review of the

25  constitutional issue, but rather, the only method by which we can determine whether a silent state

26  court decision is objectively unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.

1   2003).

2      When reviewing a state court's summary denial of a claim, the court "looks

3   through" the summary disposition to the last reasoned decision.  Shackleford v. Hubbard,

4   234 F.3d 1072, 1079 n.2 (9th Cir. 2000).

5      The California Court of Appeal was the last state court to issue a reasoned

6   decision addressing petitioner's claims 17-19 herein.  No state court issued a reasoned decision

7   addressing the remaining claims.  Accordingly, the undersigned independently reviews the record

8   in order to determine whether the summary denial of these claims by the California Supreme

9   Court in the order denying petitioner's state habeas petition was an unreasonable application of

10  clearly established Supreme Court authority.  The claims are addressed in numeric order below.

11  III. Background

12     The opinion of the California Court of Appeal contains a factual summary.  After

13  independently reviewing the record, the undersigned finds this summary to be accurate and

14  adopts it herein:

15      Facts and Procedural History
        A security guard monitored defendant and a companion, Andrea Sutch, on video
16      surveillance cameras as they walked through store aisles. The guard saw Sutch
        take three handfuls of Sudafed packages and place them in the shopping cart. The
17      pair then walked to another aisle, where defendant took a pail of margarita mix,
        slowly popped open the top, removed the pail's contents, and placed the Sudafed
18      inside the empty pail. He then placed bags of lentils on top of the pills, and closed
        the pail.
19
        At the checkout counter, defendant and Sutch paid for the margarita mix but not
20      the contents that had been placed inside the pail. As Sutch pushed the cart out of
        the store, the security guard stopped them.
21
        The guard opened the pail of margarita mix, and discovered 12 boxes of Sudafed,
22      valued at $5.62 apiece, and two bags of lentils, priced at $1.59 each. Defendant
        had $10 in his possession, and Sutch had $300.
23
        Defendant was charged with petty theft with a prior conviction, and possession of
24      ephedrine or pseudoephedrine with intent to manufacture methamphetamine.
        Sutch was charged with the same offenses, but her case was severed from that of
25      defendant.

26      The prosecution sought to introduce evidence of defendant's prior conviction for

manufacturing methamphetamine, arguing this evidence was relevant to establish defendant's intent on this occasion. The court ruled this evidence admissible under Evidence Code sections 1101 and 352. (Further undesignated statutory references are to the Evidence Code.) The prosecution stated it would present this evidence through a certified copy of the conviction, rather than through live testimony.

At trial, the security guard described defendant's actions in the store. A police officer testified that individuals often use Sudafed to manufacture methamphetamine. He estimated that the quantity of Sudafed in this case would have yielded more than 12 grams of methamphetamine, with a street value of $500-$600. The prosecution also introduced into evidence a multipage packet containing the certified copy of defendant's prior conviction for manufacturing methamphetamine.

Defendant introduced evidence from a police officer who spoke to Sutch at the jail. Sutch told him that she had concealed the Sudafed, and added that the officer "could let [defendant] go and she would take the rap ...." In cross-examination, the same officer said Sutch had told him previously "that she didn't know anything about how the Sudafed got in the bucket and that she didn't do it."

In closing arguments, defense counsel argued that it was Sutch, not defendant, who was guilty of the charged offenses. He challenged the accuracy of the security guard's observations, and emphasized Sutch's statement to police officers that she, and not defendant, had concealed the Sudafed.

The jury convicted defendant of both charged offenses, and the trial court found the alleged prior convictions to be true. Sentenced to an aggregate sentence of 12 years, defendant appeals.

Dkt. No. 13, Exhibit A, pp. 2-4.

IV.    Discussion

    A.    Claims 1-5

        Claims 1-5 concern the alleged bias of juror No. 8025.  The background to these claims is as follows:

        During voir dire, the trial court asked the jury if any of them had a family member or a close friend who had been charged with petty theft or methamphetamine use or who had a problem with methamphetamine.  (Reporter's Augmented Transcript ("RAT") at 42-43).  In response, juror No. 8025 responded,

Juror No. 8025: About three years ago there was living quarters in the front of my shop area and my sister-in-law lived there with her boyfriend and NET-5 come in and broke in the front door and ran the drug dogs through there and I just

1   happened to pull up and they started to knock down my door in but I had keys and
    they found drugs, stolen merchandise, stolen credit cards, loaded shotgun behind
2   the door and he ended up going to jail.

3   Court: The items that you just indicated were found in the area that your brother-
    in-law was residing in?

4

5   Juror No. 8025: Yes.  And when they first come he threw some drugs–there was
    like a space in between the trusses between his shop area and my shop area and he
    threw some drugs over in my shop area trying to get rid of them.

6

7   (RAT at 48-49.)

8               Later, the prosecutor asked Juror No. 8025 further questions about the NET-5 bust

9   of his shop:

10  Prosecutor:  Mr. XXXXX (8025), you told us how NET-5 broke down your door.
    Was there anything about what they did and how they handled searching your
11  shop that–

12  Juror No. 8025: Well, I had to pay for the doors that broke up, microwave and
    when I was there at the shop he got released right away and then when I was at the
13  shop working I kept a loaded 12-gauge because of the riffraff coming in and out
    and 2 and 2 go together.  Drugs and stealing.

14
    Prosecutor: So NET-5 didn't pay for your door?
15
    Juror No. 8025: No.  Or the microwave.
16
    Prosecutor: What happened to the microwave?
17
    Juror No. 8025: The battering ram, when they used the battering ram I had the
18  microwave behind the door because I didn't come and go through that area so the
    battering ram went through the door and toasted the microwave.
19
    Prosecutor: Could you sit and hear this case on the facts that we present and the
20  evidence that we present and not think about your microwave and your door?

21  Juror No. 8025: No.  Because it's like once you get to a certain point I hate to say
    it, he's kind of made it here.  To me if he's made it here, he's either running with
22  the wrong group that are doing that or he's guilty.

23  Prosecutor: Would you be able to sit here and hear the evidence and if I do not
    prove the case, return a not guilty verdict?
24
    Juror No. 8025: No.  Because he's got strikes against him already just because
25  he's here.

26  Prosecutor: Just because he got arrested?

6

1      Juror No. 8025: Yeah.

2      Prosecutor: Would you agree that everybody in this country has the right to have a case proven against them beyond a reasonable doubt?

3

4      Juror No. 8025: Not in all cases.

5      Prosecutor: Thank you. I have no further questions, Your Honor.

6 (RAT at 54-55.)

7      The trial judge then called the prosecutor and defense counsel into chambers and

8 asked if they wanted to strike any of the prospective jurors based on the information they had

9 elicited. (RAT at 55.) The prosecutor asked that jurors Valdez and Alvarez-Bonilla be struck for

10 cause. (RAT at 56.)

11      Starting with Evelyn Valdez she has sons who died of car crash due to methamphetamine. She admitted she couldn't be fair. Ms. Alvarez-Bonilla

12 similarly. If family members were not fairly treated by law enforcement, she stated she could not be fair. She doesn't think that people should be punished for

13 having drug problems. She doesn't think people should go to jail. I think she's biased...

14

15 (RAT at 56-57.)

16      The prosecutor also stated that juror No. 8025 should be struck for cause because

17 "[h]e said he couldn't be fair." (RAT at 57.) Defense counsel also moved to strike juror

18 No. 8025 for cause: "As to Mr. XXXXX (8025) different reasons, same result. I think the

19 totality of the circumstances he's presented us with today not just the single incident point

20 towards cause." (RAT at 57.) Regarding the other jurors, defense counsel stated, "On Valdez

21 the same. On Alvarez-Bonilla I would simply make the same observations in fairness that I've

22 already made about Mr. Dombo. This feels more like an effort to get out of here than it does—."

23 (RAT at 57.)

24      The trial judge denied the joined motion to strike juror No. 8025 for cause:

25      Just my observations on these individuals, these four individuals that you have discussed. Mr. XXXXX (8025) and Ms. Alvarez-Bonilla appear to me at this

26 juncture to be trying to state a reason to get off the jury. This follows the

dismissal of Dombo, Gebert and Smith.  The questions that we were asking on drug usage do not go directly to what is charged in this case.  Their opinions on drug usage are areas that either of you may wish to make additional follow-up questions.  I'll allow you to give that a go in chambers if you wish.  However, my conclusion is at this point is that each of these individuals the way they answered the question they're looking around, if you will, they were aware of their audience, if you will, they were picking up ... thread of ways in my opinion to get out of their service here today.  They did not state a reason concerning the merits of this case as to why they should be excused for cause...

(RAT at 57-58.)

The trial judge then denied the motion to excuse juror No. 8025 for cause and asked trial counsel and the prosecutor if they wished to call this juror in for further questioning. (RAT at 58.)  Both trial counsel and the prosecutor declined to ask juror No. 8025 further questions.  (Id.)

Neither party exercised a peremptory strike to have juror No. 8025 removed from the jury.

Claim 1

Petitioner argues that he was denied his right to an impartial jury when the trial judge refused to dismiss juror No. 8025 for cause.

The Sixth Amendment guarantees to the criminally accused a fair trial by a panel of impartial jurors.  Irvin v. Dowd, 366 U.S. 717, 722 (1961).  "Even if only one juror is unduly biased or prejudiced, the defendant is denied his constitutional right to an impartial jury." Tinsley v. Borg, 895 F.2d 520, 523-24 (9th Cir. 1990) (internal quotations omitted).  The Constitution, however, "does not require a new trial every time a juror has been placed in a potentially compromising situation."  Smith v. Phillips, 455 U.S. 209, 217 (1982).  Rather, the safeguards of juror impartiality, such as voir dire and protective instructions from the trial judge, are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote.  Smith, 455 U.S. at 217.

The Ninth Circuit has recognized that to disqualify a juror for cause requires a showing of actual bias or implied bias; that is, "bias in fact, or bias conclusively presumed as a

1  matter of law." United States v. Gonzalez, 214 F.3d 1109, 1111-12 (9th Cir. 2000).  There are

2  three theories of juror bias based on a misstatement by a juror during voir dire:

3  (1) McDonough-style bias (i.e., the juror fails to answer honestly and, had he answered correctly,

4  the information would have provided a basis for a challenge for cause, see McDonough Power

5  Equip., Inc. v. Greenwood, 464 U.S. 548 (1984)), (2) "actual bias, which stems from a pre-set

6  disposition not to decide an issue impartially," and (3) "implied (or presumptive) bias, which

7  may exist in exceptional circumstances where, for example a prospective juror has a relationship

8  to the crime itself or to someone involved in a trial, or has repeatedly lied about a material fact to

9  get on the jury." Fields v. Brown, 503 F.3d 755, 766 (9th Cir. 2007) (en banc).

10         The presence of a biased juror is a structural error entitling the defendant to a new

11  trial.  Estrada v. Scribner, 512 F.3d 1227, 1235 (9th Cir. 2008) (citing Dyer v. Calderon,

12  151 F.3d 970, 973 n. 2 (9th Cir. 1998)).  Presence of a biased juror is a question of fact, and

13  accorded deference under 28 U.S.C. § 2254.  Id., 512 F.3d at 1235, 1240 (citing Dyer, 151 F.3d

14  at 973 n. 2).  Actual bias is present when a juror has "a state of mind that leads to an inference

15  that the person will not act with entire impartiality." Id., 512 F.3d 1227, 1240 (9th Cir. 2008),

16  quoting United States v. Gonzalez, 214 F.3d 1109, 1112 (9th Cir. 2000) (internal quotation

17  omitted).

18         In the instant case, petitioner argues that the trial court erred in failing to grant the

19  joint motion to dismiss juror No. 8025 for cause.  Petitioner contends that juror No. 8025 made

20  clear statements that he could not be impartial.  Petitioner further argues that the trial court's

21  "hunch" that juror No. 8025 was lying was unsupported and even if it were true, this would

22  render him unfit to serve.

23         The undersigned first considers petitioner's claim of "actual bias."  The comments

24  by juror No. 8025, on the surface, demonstrated an inability to be impartial.  However, the trial

25  judge found that these comments were insincere because they were made in an attempt to avoid

26  jury duty.  The trial judge noted that three other jurors (Dombo, Gebert and Smith) who had

expressed bias had just been removed and he concluded that juror No. 8025 was trying to follow in their footsteps.

Juror Gebert had told the court that she had been previously married to a Yuba City police officer.  (RAT at 20.)  Because she knew most of the officers on the police force, she did not believe she could be impartial.  (Id.)  She could not be impartial because she knew all the hours that her husband would write reports and that "these guys would be on the streets before his report was done."  (Id.)  The trial judge then read the jury instruction regarding witness credibility and asked juror Gebert if she could apply the same standard when judging the credibility of a police officer versus a lay person.  (RAT at 21.)  Juror Gebert responded that she did not think she could.  (Id.)  After further questioning, juror Gebert stated that she would use the same factors in judging the credibility of each witness.  (RAT at 22.)

Juror Smith told the court that she previously worked at the prison in Live Oak. (RAT at 24.)  Based on that experience, she stated that she could not be an impartial juror because she saw "too many inmates come back.  It was return to custody for parole violations and whatnot involving drugs."  (RAT at 25.)  This experience led her to have a "bad distaste in regards to drugs."  (RAT at 25.)

The trial judge later asked the jury if anyone had convictions or personal feelings about any subject that were so strong that they did not feel they could follow the jury instructions. (RAT at 32.)  In response juror Dombo stated,

> Yes.  Because I work for a junior high school.  We preach about not doing drugs and not stealing and stuff like that and I feel I wouldn't be a good juror for this gentleman sitting down over here.  I'd think he was guilty and send him to jail.

(Id.)

While the trial judge questioned jurors Smith, Gebert and Dombo more extensively in chambers, the comments quoted above were made in front of the rest of the jurors during voir dire.  Following the further questioning in chambers, jurors Smith, Gebert and Dombo were dismissed.  It was not unreasonable for the trial judge to suspect that juror No. 8025

1  fabricated his comments regarding an inability to be impartial after hearing the comments of

2  these juror who were then dismissed.  The fact that Juror No. 8025 made comments suggesting

3  that he could not be impartial to both the prosecution and the defense supported the trial judge's

4  conclusion that this juror was fabricating bias in order to avoid jury duty.[1]

5       Moreover, while the undersigned believes that the better practice would have been

6  for the trial judge to call juror No. 8025 into chambers for further questioning, the fact that

7  neither defense counsel nor the prosecutor stated that they disagreed with the judge's conclusion,

8  nor took the judge up on his offer to allow either of them to further question this juror, suggests

9  that they agreed with the judge's conclusion that the juror's comments were motivated by an

10  attempt to avoid jury duty.  Additionally, the fact that neither defense counsel nor the prosecutor

11  later used peremptory challenges to strike this juror, which they both had, also suggests that they

12  did not find juror No. 8025's claims that he could not be impartial to be sincere.

13       Petitioner next argues that even if the trial judge's conclusion about the juror's

14  motivation was correct, then juror No. 8025's willingness to lie rendered him unfit to serve.  The

15  undersigned is aware of no clearly established Supreme Court authority standing for this

16  proposition.

17       Furthermore, the Ninth Circuit has held that the failure of the trial court to

18  sua sponte hold an evidentiary hearing to investigate *potential* juror bias is not contrary to clearly

19  established Supreme Court authority.  Sims v. Rowland, 414 F.3d 1148, 1153 (9th Cir. 2005).

20  Juror No. 8025's willingness to lie in order to avoid jury service demonstrated, at most, potential

21  bias.  Here, both defense counsel and the prosecutor declined the opportunity to call juror

22  No. 8025 in for further questioning.  Accordingly, the trial judge's failure to hold a hearing

23  sua sponte was not contrary to clearly established Supreme Court authority.

24

25     [1] Juror 8025's comments regarding the NET-5 bust of his shop and that he had had to pay
   for the damage suggested an inability to be impartial to the prosecution.  Juror 8025's comments

26  that petitioner had a "strike" against him suggested an inability to be impartial to the defense.

11

1    For the reasons discussed above, after independently reviewing the record, the

2    undersigned finds that the California Supreme Court's denial of this claim was not an

3    unreasonable application of Supreme Court authority.  28 U.S.C. § 2254(d)(1).  Moreover, the

4    state court's decision did not constitute an unreasonable determination of the facts in light of the

5    evidence presented.  28 U.S.C. § 2254(d)(2).  This claim should be denied.

6        Claim 2

7    Petitioner argues that trial counsel was ineffective for failing to exercise a

8    peremptory challenge to exclude juror No. 8025.

9    The test for demonstrating ineffective assistance of counsel is set forth in

10   Strickland v. Washington, 466 U.S. 668 (1984).  First, a petitioner must show that, considering

11   all the circumstances, counsel's performance fell below an objective standard of reasonableness.

12   Id. at 688.  To this end, the petitioner must identify the acts or omissions that are alleged not to

13   have been the result of reasonable professional judgment.  Id. at 690.  The federal court must then

14   determine whether in light of all the circumstances, the identified acts or omissions were outside

15   the wide range of professional competent assistance.  Id.  "We strongly presume that counsel's

16   conduct was within the wide range of reasonable assistance, and that he exercised acceptable

17   professional judgment in all significant decisions made."  Hughes v. Borg, 898 F.2d 695, 702

18   (9th Cir. 1990) (citing Strickland, 466 U.S. at 689).

19   Second, a petitioner must affirmatively prove prejudice.  Strickland, 466 U.S. at

20   693.  Prejudice is found where "there is a reasonable probability that, but for counsel's

21   unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  A

22   reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Id.

23   In extraordinary cases, ineffective assistance of counsel claims are evaluated

24   based on a fundamental fairness standard.  Williams v. Taylor , 529 U.S. 362, 391-93 (2000)

25   (citing Lockhart v. Fretwell, 506 U.S. 364 (1993)).

26   The Supreme Court has emphasized the importance of giving deference

12

to trial counsel's decisions, especially in the AEDPA context:

> In Strickland we said that "[j]udicial scrutiny of a counsel's
> performance must be highly deferential" and that "every effort
> [must] be made to eliminate the distorting effects of hindsight, to
> reconstruct the circumstances of counsel's challenged conduct, and
> to evaluate the conduct from counsel's perspective at the time."
> 466 U.S. at 689. Thus, even when a court is presented with an
> ineffective-assistance claim not subject to § 2254(d)(1) deference,
> a [petitioner] must overcome the "presumption that, under the
> circumstances, the challenged action 'might be considered sound
> trial strategy.'" Ibid. (quoting Michel v. Louisiana, 350 U.S. 91,
> 101 (1955)).
>
> For [petitioner] to succeed, however, he must do more than show
> that he would have satisfied Strickland's test if his claim were
> being analyzed in the first instance, because under § 2254(d)(1), it
> is not enough to convince a federal habeas court that, in its
> independent judgment, the state-court decision applied Strickland
> incorrectly. See Williams, supra, at 411.[2] Rather, he must show
> that the [ ]Court of Appeals applied Strickland to the facts of his
> case in an objectively unreasonable manner.

Bell v. Cone, 535 U.S. 685, 698-99 (2002).

Establishing Strickland prejudice in the context of juror selection requires a

showing that, as a result of trial counsel's failure to exercise peremptory challenges, the jury

panel contained at least one juror who was biased. United States v. Quintero-Barraza, 78 F.3d

1344, 1349 (9th Cir. 1995).

After hearing juror No. 8025's comments regarding the treatment of his property

by NET-5, trial counsel may well have had a strategic reason for leaving him on the jury.

Similarly, in light of the judge's conclusion, with apparent counsel concurrence, that juror No.

8025 was merely trying to get out of jury duty, defense counsel may have strategically decided

that the juror might hold it against the prosecution that he had to continue to serve as a juror and

sit through the trial.  In light of such possible reasons, the undersigned cannot state that counsel

was ineffective in leaving juror No. 8025 on the jury.

---

[2]  This internal citation should be corrected to Williams v. Kaiser, 323 U.S. 471, 477
(1945).

1    After independently reviewing the record, the undersigned finds that the denial of

2    this claim by the California Supreme Court was not an unreasonable application of clearly

3    established Supreme Court authority.

4    Claim 3

5    Petitioner argues that his right to an impartial jury was violated because all of the

6    jurors in his case saw that a venire member, juror No. 8025, could presume petitioner guilty at

7    the outset but still serve on the jury.  The only federal case petitioner cites in support of this

8    claim is Mach v. Stewart, 137 F.3d 630 (9th Cir. 1997).

9    In Mach, during voir dire the trial court elicited from juror Bodkin that 1) she had

10   taken child psychology courses and worked with psychologists, she worked with children as a

11   social worker; and 2) four separate statements that she had never been involved in a case in

12   which a child accused an adult of sexual abuse where that child's statements had not been borne

13   out. 137 F.3d at 633.   The trial court also elicited a statement from juror Bodkin that she had

14   never known a child to lie about sexual abuse.  Id.  The Ninth Circuit found that when the

15   petitioner moved for a mistrial, the trial court should have conducted further voir dire to

16   determine whether the panel had been infected with Bodkin's expert-like statements.  Id.  The

17   Ninth Circuit presumed that at least one juror was tainted and entered the jury deliberations with

18   the conviction that children never lie about being sexually abused.  Id.  The Ninth Circuit held

19   that this bias violated the petitioner's right to an impartial jury.  Id.

20   Mach is distinguishable from the instant case.  At petitioner's trial, juror No. 8025

21   did not offer an expert opinion regarding the evidence.  Rather, juror No. 8025 expressed his own

22   personal opinion that he supposedly could not be impartial.  It is not likely that the other jurors,

23   who had expressed an ability to be impartial, were swayed by juror No. 8025's views, which

24   were found not to be sincere.  The undersigned is aware of no case law supporting petitioner's

25   claim that a juror who states that they cannot be impartial during voir dire, who then serves on

26   the jury, renders the entire jury biased.  Petitioner's claim is truly an extension of claim one, i.e.

1  that juror No. 8025 was biased.  In any event, it is not uncommon for jurors to express personal

2  opinions during voir dire suggesting an inability to be impartial which are then clarified during

3  an informal hearing outside the presence of the rest of the jury pool.

4        This claim is not supported by clearly established Supreme Court authority.

5  Accordingly, after independently reviewing the record, the undersigned finds that the denial of

6  this claim by the California Supreme Court was not an unreasonable application of clearly

7  established Supreme Court authority.

8        Claim 4

9        Petitioner argues that his trial counsel was ineffective for failing to move for a

10  mistrial on grounds that the entire jury was biased.  Petitioner argue that trial counsel should have

11  moved for a mistrial on ground that juror No. 8025 was biased and unfit to serve as a juror.

12  Petitioner also argues that his trial counsel should have argued that the entire jury was tainted

13  because all jurors heard juror No. 8025's comments.

14        Under California law, "'[a] mistrial should be granted if the court is apprised of

15  prejudice that it judges incurable by admonition or instruction.  Whether a particular incident is

16  incurably prejudicial is by its nature a speculative matter, and the trial court is vested with

17  considerable discretion in ruling on mistrial motions.'"  People v. Wallace, 44 Cal.4th 1032,

18  1068 (2008) (internal citations omitted).

19        As discussed above, the state court's finding that juror No. 8025 was not biased is

20  entitled to a presumption of correctness.  Therefore, a motion for a mistrial based on alleged bias

21  by juror No. 8025 had no merit, nor was petitioner prejudiced by counsel's failure to make such a

22  motion.

23        After independently reviewing the record, the undersigned finds that the denial of

24  this claim by the California Supreme Court was not an unreasonable application of clearly

25  established Supreme Court authority.

26  ////

1      Claim 5

2      Petitioner argues that appellate counsel was ineffective for failing to raise grounds

3 1-4 on appeal.  A claim of ineffective assistance of appellate counsel uses the same Strickland

4 standard that is applied to trial counsel.  Smith v. Robbins, 528 U.S. 259, 287 (2000).

5      Because these claims are without merit, petitioner was not prejudiced by appellate

6 counsel's failure to raise these claims on appeal.  In addition, petitioner raised these claims in a

7 habeas corpus petition which the California Supreme Court denied on the merits.  See

8 Petitioner's Habeas Petition filed in California Supreme Court, lodged June 1, 2006.  The

9 outcome would have been no different had these claims been raised on direct appeal.

10      After independently reviewing the record, the undersigned finds that the denial of

11 this claim by the California Supreme Court was not an unreasonable application of clearly

12 established Supreme Court authority.  Accordingly, this claim should be denied.

13      In the traverse, petitioner additionally argues that appellate counsel was

14 ineffective for failing to raise claims of juror bias based on violations of *state law*.  The amended

15 petition did not raise a claim of ineffective assistance of appellate counsel based on appellate

16 counsel's failure to raise state law juror bias claims.

17      A claim of ineffective assistance of appellate counsel based on failure to raise a

18 state law claim is different from a claim of ineffective assistance of appellate counsel based on

19 failure to raise a claim for violation of the United States Constitution.  Because petitioner's

20 amended petition did not allege that appellate counsel was ineffective for failing to raise a claim

21 of juror bias based on state law, this claim raised in the traverse is disregarded.  See Cacoperdo v.

22 Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994) (a traverse is not the proper pleading to raise

23 additional grounds for relief); Greenwood v. Fed. Aviation Admin., 28 F.3d 971, 977 (9th Cir.

24 1994) ("we review only issues which are argued specifically and distinctly in a party's opening

25 brief").

26 ////

B. <u>Claims 6-11</u>

The background to these claims is as follows.  Both petitioner and Andrea Sutch were charged with petty theft with a prior and possession of ephedrine with the intent to manufacture methamphetamine.  (Clerk's Transcript ("CT") at 16-17.)  After the trial court ruled that petitioner's prior conviction for manufacturing methamphetamine could be admitted, Sutch's counsel requested that her trial be severed from petitioner's trial.  (CT at 63-64.)  The trial court granted this request.  (CT at 64).  After this motion was granted, the prosecutor requested that petitioner be tried first.  (<u>Id</u>.)  Petitioner's counsel objected:

> Your Honor, the People are making essentially a judicial economy argument versus right to confrontation argument.  What they are saying is because Mr. Benjamin is in their opinion the primary actor that settling this case would make it very easy to give whatever offer they are going to give Miss Sutch.
>
> Although I'm not attempting to enter this into the record, I would indicate on the last page of the police report at booking at the jail without time for any information to be exchanged between the defendants, without pressure being able to be applied, Miss Sutch said she did it all. Let Benjamin go.  She will take the blame for the theft.  That's a pretty important statement, your Honor.  Of course, there being an in limine motion filed to that statement coming in.  I believe that's fairly intriguing testimony on behalf of Mr. Benjamin and his defense.  I would think relative to his right to confront witnesses against him or to have information relative to be entered, it is better for Mr. Benjamin's rights that Miss Sutch go first, that she be available no matter what the outcome as a witness in Mr. Benjamin's case.
>
> Further, the individuals – observations by the individual who was watching these two would lend credence that she was not an unknowing dupe, that she was actively involved in all aspects of this alleged crime.  That would be our request. That if we are going to do it on different days, they go first.

(CT at 64-65.)

The trial judge ruled that petitioner would go to trial first.  (CT at 66.)

When petitioner called Sutch to testify at trial, she exercised her Fifth Amendment right to be silent.  (Reporter's Transcript ("RT") at 240-43.)  During this proceeding, as well as during the entire proceedings, Sutch was represented by counsel.

During his examination of the arresting officer, petitioner's counsel asked if Sutch made any statements when they arrived at jail.  The arresting officer responded, "At the jail she

told me that she took the Sudafed." (RT at 249.)  The arresting officer further testified, "She said that she put the Sudafed or concealed it in a pail or bucket and that I could let Mr. Benjamin go and she would take the rap or something to that effect." (Id.)

On cross-examination, the arresting officer testified that before telling him that petitioner was not responsible, Sutch had stated to him that "she didn't know anything about how the Sudafed got in the bucket and she didn't do it." (Id.)

On March 26, 2001, after petitioner was found guilty, Sutch plead guilty to misdemeanor theft with a prior. (Petitioner's Exhibit 2.)  The second charge of possession of ephedrine was dismissed. (Id.)  Sutch was sentenced to one day of county jail time with credit for time served, 36 months of probation, a $221 fine and restitution of $10. (Petitioner's Exhibit 3.)

On April 9, 2001, Sutch wrote a letter stating that she was the one who put the Sudafed in the bucket. (CT at 276-78.)  She wrote, "The first moment that Danny realized that I was serious about buying Sudafed for an old acquaintance that was also there, he began telling me that I was whacked (stupid) and walked away leaving me to shop alone.  I can't tell you exactly where he went, but it was then that I made the most ignorant decision..." (Id.)  In this letter, Sutch states that on the first day of court, she planned to make an appointment to meet with the D.A. and tell them what really happened. (Id.)  She returned home early and caught petitioner with an ex-girlfriend. (Id.)  Sutch was devastated and "lost it." (Id.)  "So out of pure spite to ruin some of the fun he was having I said nothing of his innocence." (Id.)  In this letter Sutch states that she would be willing to take a lie detector test. (Id.)

Attached to the third amended petition as exhibit 1 is the declaration of Linda Humble, an investigator for petitioner's counsel.  Ms. Humble states that on September 13, 2004, she interviewed Sutch who told her that she asserted her rights under the Fifth Amendment, and refused to testify at petitioner's trial, because the prosecutor told her that the prosecution would seek prison time on her case if she testified on petitioner's behalf.

Claim 6

Petitioner argues that he was denied his right to a fair trial based on the prosecutor's failure to grant Sutch use immunity for her testimony at his trial in conjunction with the prosecutor's manipulation of the order in which the cases were prosecuted and the threats to retaliate against Sutch if she testified.

If a trial court unduly interferes with a defense witness' choice whether to testify, the trial court's conduct may amount to a due process violation.  Webb v. Texas, 409 U.S. 95, 97-98 (1972) (defense witness influenced not to testify by intimidating remarks of trial judge). Although the Supreme Court has not yet considered whether similar interference by a prosecutor would violate a defendant's due process rights, the Ninth Circuit has extended the rule of Webb to encompass the conduct of prosecutors as well.  See Earp v. Ornoski, 431 F.3d 1158, 1167-68 (9th Cir. 2005) (prosecutor's intimidating threats to prevent witness from testifying may amount to misconduct; case remanded for evidentiary hearing); United States v. Vavages, 151 F.3d 1185, 1189-90 (9th Cir. 1998) (holding that a prosecutor's conduct is also governed by Webb, and asserting that "a defendant's constitutional rights are implicated only where the prosecutor or trial judge employs coercive or intimidating language or tactics that substantially interfere with a defense witness' decision whether to testify.").

In her letter to the court immediately following her sentencing, Sutch stated that she chose not to tell the truth at the time of petitioner's trial because she was mad at him for being with an ex-girlfriend.  In this letter, Sutch makes no mention of any fear of further prosecution.  Her statement to petitioner's investigator that she did not testify out of fear of further prosecution contradicts her letter.  The declaration by petitioner's investigator does not explain this contradiction.  Based on these conflicting statements, the undersigned cannot find that petitioner has demonstrated that Sutch's decision to testify was caused by improper interference by the prosecution.

In any event, assuming Sutch's later version of events is true, the undersigned

finds no improper government interference.  In essence, Sutch is suggesting that the prosecutor

offered to allow her to plead to a misdemeanor petty theft charge on the condition that she not

accept responsibility for the stolen Sudafed.  Had she accepted responsibility for stealing the

Sudafed, she would have received a prison sentence.  This was not an unreasonable

representation by the prosecutor because had Sutch testified that she stole the Sudafed, she would

have exposed herself to prosecution for a felony offense that involved prison time.  Where, under

the totality of the circumstances, "'the substance of what the prosecutor communicates to the

witness is a threat over and above what the record indicates is necessary, and appropriate, the

inference that the prosecutor sought to coerce a witness into silence is strong.'" United States v.

Pierce, 62 F.3d 818, 832 (6th Cir. 1995) (quoting United States v. Jackson, 935 F.2d 832, 847

(7th Cir. 1991)).  In the instant case, what the prosecutor allegedly communicated to Sutch was

not over and above what the record indicated.  Moreover, Sutch made the decision not to testify

after consulting with her lawyer.

        In addition, to succeed on the claim that the prosecutor improperly interfered with

Sutch's decision to testify, petitioner must demonstrate that the witnesses' testimony would have

"been both material and favorable to his defense."  United States v. Valenzuela-Bernal, 458 U.S.

858, 867 (1982) (footnote omitted).  Evidence is material if it might have affected the outcome of

the trial.  Id.  For the following reasons, the undersigned finds that had the jury heard Sutch

testify, it is extremely unlikely that the outcome of the trial would have been different.

        In her letter to the court, Sutch states that she put the Sudafed in the margarita

bucket.  (CT at 276.)  In contrast, Yuba County Sheriff's Deputy Jensen testified that while

working as a security guard at Winco, he watched Sutch take three handfuls of Sudafed and put

them in the shopping cart.  (RT at 189.)  He next saw petitioner take a margarita mix pail and

slowly begin to pop the lid off.  (RT at 190.)  After getting the lid partially off, petitioner put the

bucket in the cart and finished popping the lid off as he walked down the aisle.  (RT at 191.)

Petitioner then removed the contents of the pail, which was a bag of liquid, and put it on a shelf.

1  (RT at 192.)  Petitioner then filled up the bucket with the Sudafed.  (RT at 193.)  Petitioner later

2  put some lentils on top of the Sudafed.  (Id.)  Deputy Jensen testified that he did not see Sutch

3  put the Sudafed in the margarita container or touch the lentils. (RT at 194.)  After petitioner put

4  the lentils in the bucket, he secured the lid.  (Id.)

5         Sutch's version of events directly contradicted Deputy Jensen's version.  It is very

6  likely that a jury would have disbelieved Sutch because she had a motive to lie in order to protect

7  petitioner and because she had, at one point, stated that petitioner was responsible for the stolen

8  Sudafed.  Whereas Deputy Jensen was credible, Sutch was not.  For this reason, the undersigned

9  finds that Sutch's testimony was not material.  On that ground, petitioner's claim that the

10  prosecutor improperly influenced Sutch not to testify should be denied.

11         As a separate claim, petitioner argues that the prosecutor violated his

12  constitutional rights by failing to grant Sutch use immunity.  A criminal defendant is not entitled

13  to compel the government to grant immunity to a witness.  United States v. Shirley, 884 F.2d

14  1130, 1133 (9th Cir. 1989).

15         The Ninth Circuit has recognized an exception to this rule in cases where the

16  fact-finding process is intentionally distorted by prosecutorial misconduct, and the defendant is

17  thereby denied a fair trial.  United States v. Lord, 711 F.2d 887, 892 (9th Cir. 1983).  However,

18  there is no clearly established Supreme Court authority in support of this exception.

19  Nevertheless, in Williams v. Woodford, 384 F.3d 567 (9th Cir. 2004), the Ninth Circuit applied

20  this exception in a habeas corpus action.  The prosecution's refusal to grant use immunity to a

21  defense witness denies the defendant a fair trial only when the defendant can prove:  (1) the

22  witness's testimony would have been relevant; and (2) the prosecution refused to grant the

23  witness use immunity with the deliberate intention of distorting the fact-finding process.

24  Williams, 384 F.3d at 600 (emphasis added).

25         As for the first prong of the Williams v. Woodford test, Sutch's testimony,

26  although not particularly helpful, would have been relevant.  To demonstrate the prosecutorial

misconduct of the second prong, petitioner must show that the prosecution intentionally caused Sutch to invoke the Fifth Amendment right against self-incrimination.  Williams, 384 F.3d at 600.  For the same reasons the undersigned above found that the prosecutor did not improperly interfere with Sutch's decision not to testify, the undersigned finds that petitioner has not demonstrated prosecutorial misconduct.

After independently reviewing the record, the undersigned finds that the denial of this claim by the California Supreme Court was not an unreasonable application of clearly established Supreme Court authority.  Accordingly, this claim should be denied.

Claim 7

Petitioner argues that his trial counsel was ineffective for failing to request that the trial court order that Sutch be granted immunity for any testimony she gave in petitioner's case.  In the alternative, petitioner argues that his counsel should have moved for a judgment of acquittal based on the prosecution's failure to grant use immunity.

The California Supreme Court has not directly addressed the issue of whether courts possess the authority to confer immunity on potential witnesses absent the consent of the prosecution.  However, in dicta, the California Supreme Court stated:  "if immunity for a defense witness is ever constitutionally compelled, it is so compelled only when the witness's testimony is both clearly exculpatory and essential to an effective defense, and when no strong governmental interest weighs against the grant of immunity."  People v. Cudjo, 6 Cal.4th 585, 620 (1993).

As discussed above, Sutch's claim that she put the Sudafed in the margarita bucket was not credible.  Rather, it was a fairly obvious attempt to help petitioner avoid being convicted.  For these reasons, the undersigned does not find that her testimony was clearly exculpatory and essential to petitioner's defense.  Because the trial court would most likely have denied a request by trial counsel that Sutch be granted use immunity, petitioner's claim that counsel was ineffective for not making such a request is without merit.

22

1    Petitioner also argues that his trial counsel should have moved to dismiss the

2  charges based on the prosecutor's misconduct in connection with Sutch's decision not to testify.

3  The undersigned presumes that petitioner is arguing that the grounds of this motion would be

4  based on relevant state law.

5    The California standards for claims of interference with the right to present

6  witnesses are similar to those under federal law.  To prevail on a claim of interference with the

7  right to present witnesses, a defendant must demonstrate, first, misconduct on the part of the

8  prosecutor. "To do so, he is not required to show that the governmental agent involved acted in

9  bad faith or with improper motives.  Rather, he need show only that the agent engaged in activity

10 that was wholly unnecessary to the proper performance of his duties and of such a character as

11 'to transform [a defense witness] from a willing witness to one who would refuse to testify....'"

12 In re Martin, 44 Cal.3d 1, 31, 241 Cal.Rptr. 263 (1987) (internal citations omitted).

13    Second, "the defendant must also demonstrate interference, i.e., a causal link

14 between the misconduct and his inability to present witnesses on his own behalf.  To do so, he is

15 not required to prove that the conduct under challenge was the 'direct or exclusive' cause.

16 Rather, he need only show that the conduct was a substantial cause.  The misconduct in question

17 may be deemed a substantial cause when, for example, it carries significant coercive force and is

18 soon followed by the witness's refusal to testify." Id. (internal citations omitted).

19    "Finally, the defendant must also demonstrate 'materiality.'  To carry his burden

20 under federal law, 'he must at least make some plausible showing of how [the] testimony [of the

21 witness] would have been both material and favorable to his defense.'  Under California law he

22 must show at least a reasonable possibility that the witness could have given testimony that

23 would have been both material and favorable." Id. at 32 (internal citations omitted).

24    For the reasons discussed above, the undersigned finds that the prosecutor did not

25 engage in activity that was wholly unnecessary to the proper performance of his duties.  In

26 addition, petitioner has not demonstrated a link between the alleged misconduct and Sutch's

23

1  decision not to testify.  Petitioner has not adequately explained the contradictory reasons given by

2  Sutch for her decision not to testify.  In fact, at the time petitioner claims counsel should have

3  made the motion for acquittal, Sutch's version of events was that she did not tell the truth

4  because she was mad at petitioner for being with another woman.  Finally, for the reasons

5  discussed above, the undersigned finds that petitioner has not demonstrated that Sutch's

6  testimony was material.  Because a motion for acquittal based on prosecutorial misconduct

7  almost certainly would have been denied, petitioner's counsel was not ineffective for not making

8  this motion.

9         After independently reviewing the record, the undersigned finds that the denial of

10  these claims by the California Supreme Court was not an unreasonable application of clearly

11  established Supreme Court authority.  Accordingly, these claims should be denied.

12         Claim 8

13         Petitioner argues that his appellate counsel was ineffective for failing to argue on

14  appeal that petitioner was deprived of his right to due process by the prosecutor's manipulation

15  of the judicial system to prevent his co-defendant from testifying.  In support of this claim,

16  petitioner cites the grounds set forth in claim 6.

17         As discussed above, claim 6 has no merit.  Had appellate counsel raised this claim

18  on appeal, it almost certainly would have been denied.  Moreover, petitioner raised this claim in a

19  habeas corpus petition filed in the California Supreme Court.  See Petitioner's Habeas Petition

20  filed in the California Supreme Court, lodged June 1, 2006.  This petition was denied on the

21  merits.  The outcome would have been no different had these claims been raised on direct appeal.

22  Petitioner was not prejudiced by appellate counsel's failure to raise this claim.

23         After independently reviewing the record, the undersigned finds that the denial of

24  this claim by the California Supreme Court was not an unreasonable application of clearly

25  established Supreme Court authority.  Accordingly, this claim should be denied.

26  ////

1        Claim 9

2        Petitioner argues that he was denied his right to confrontation by the admission

3 into evidence of his co-defendant's statement that she had no knowledge of the offense for which

4 they were both suspects.

5        The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal

6 prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against

7 him[.]"  U.S. Const. amend. VI.  This right attaches to state court prosecutions through the

8 Fourteenth Amendment.  Pointer v. Texas, 380 U.S. 400, 403 (1965).  "The central concern of

9 the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant

10 by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of

11 fact."  Maryland v. Craig, 497 U.S. 836, 845 (1990).  Confrontation Clause cases "fall into two

12 broad categories: cases involving the admission of out-of-court statements and cases involving

13 restrictions imposed by law or by the trial court on the scope of cross-examination."  Delaware v.

14 Fensterer, 474 U.S. 15, 18 (1985) (per curiam).  Petitioner's case is of the former variety, as the

15 essence of his claim is that the prosecution was allowed to introduce an alleged out-of-court

16 statement of an unavailable declarant.

17        The Confrontation Clause bars the admission of a hearsay statement made by a

18 declarant who is not available for cross-examination at trial unless that statement "bears adequate

19 'indicia of reliability.'"  Ohio v. Roberts, 448 U.S. 56, 66 (1980).[3]  Sutch was unavailable because

20 she exercised her Fifth Amendment privilege against self-incrimination.

21 _____

22      [3]  In Crawford v. Washington, 541 U.S. 36 (2004), the Supreme Court revised the test for
determining the admissibility of hearsay statements.  In Whorton v. Bockting, 549 U.S. 406
23 (2007), the Supreme Court held that Crawford announced a new rule of criminal procedure,
applicable only to cases not already final on direct review.  Here, petitioner's direct review
24 became final on July 15, 2003.  Dkt. 13, Exhibit C.  See Caspari v. Bohlen, 510 U.S. 383, 390-91
(1994) ("A state conviction and sentence become final for purposes of retroactivity analysis when
25 the availability of direct appeal to the state courts has been exhausted and the time for filing a
petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied.").
26 Accordingly, because Crawford was decided after petitioner's direct review was final, it is not
applicable.

1    There are two ways to meet the reliability requirement of the Confrontation

2  Clause.  First, "[r]eliability can be inferred without more in a case where the evidence falls

3  within a firmly rooted hearsay exception."  Id.  Second, if the evidence does not fall within a

4  firmly rooted exception, it may be admitted if there is a sufficient "showing of particularized

5  guarantees of trustworthiness" such that adversarial testing would be expected to add little, if

6  anything, to the statement's reliability.  Id.

7    Respondent contends that Sutch's statement was admitted as a declaration against

8  penal interest pursuant to California Evidence Code § 1230.  In Lilly v. Virginia, 527 U.S. 116

9  (1999), the Supreme Court held that, "accomplices' confessions that inculpate a criminal

10  defendant are not within a firmly rooted exception to the hearsay rule as that concept has been

11  defined in our Confrontation Clause jurisprudence."  527 U.S. at 134.

12    As for the second hearsay exception, there was no showing of a particularized

13  guarantee of trustworthiness regarding Sutch's statement.  Adversarial testing would clearly have

14  impacted the reliability of her statement.

15    Having found that admission of Sutch's statement violated the Confrontation

16  Clause, the undersigned must determine whether this error was harmless.  Olden v. Kentucky,

17  488 U.S. 227, 232 (1988) (per curiam) (Confrontation Clause violations are subject to harmless

18  error analysis).  Constitutional errors are harmless unless they have a "substantial and injurious

19  effect or influence in determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 637

20  (1993).

21    Admissions of Sutch's statement that she did not know how the Sudafed got in the

22  bucket and that she did not do it did not have a substantial and injurious effect on the jury's

23  verdict.  The jury heard credible and detailed testimony from the officer who witnessed petitioner

24  open the margarita bucket, put the Sudafed in it, cover the Sudafed with lentils and then put the

25  lid back on top.  The officer testified that he did not see Sutch put the Sudafed in the bucket or

26  touch the lentils.  Had Sutch's statement not been admitted, the outcome of the trial would have

1    been the same.

2              After conducting an independent review of the record, the undersigned finds that

3    the denial of this claim by the California Supreme Court was not an unreasonable application of

4    clearly established Supreme Court authority.  Accordingly, this claim should be denied.

5              Claim 10

6              Petitioner argues that his counsel was ineffective for failing to request that the

7    trial court instruct the jury that Sutch's prior inconsistent statement that she did not know

8    anything about how the Sudafed got in the bucket could *not* be considered for the truth of the

9    matter asserted.  Petitioner further argues that counsel was ineffective for failing to object to the

10   misleading instruction regarding a witness' prior inconsistent statement.

11             Petitioner contends that the only basis for admission of Sutch's statement that she

12   did not know how the Sudafed got in the bucket was California Evidence Code § 1202 which

13   provides, in relevant part:

14             Evidence of a statement or other conduct by a declarant that is inconsistent with a
             statement by such declarant received in evidence as hearsay evidence is not
15             inadmissible for the purpose of attacking the credibility of the declarant though he
             is not given and has not had an opportunity to explain or to deny such inconsistent
16             statement or other conduct.

17   Cal. Evid. Code § 1202.

18             Petitioner argues that the only purpose for which § 1202 evidence can be

19   considered is to judge the credibility of a declarant.  Petitioner argues that his lawyer should have

20   asked for a jury instruction that would have informed the jury that it could only consider Sutch's

21   statement that she did not know anything about how the Sudafed got in the bucket for the

22   purposes of judging her credibility.  Petitioner argues that instead, defense counsel offered no

23   objection to the trial judge's misleading instruction that a witness's prior inconsistent out-of-

24   court statement could be considered for the purposes of impeachment *and* for the truth of the

25   matter asserted.  Petitioner contends that this instruction misled the jury because it was given

26   right after a separate instruction regarding Sutch, and because no prior inconsistent statements

other than Sutch's were offered into evidence.  Petitioner contends that as a result, the jury must

have believed that it could consider Sutch's claim of ignorance and innocence for the truth of the

matter asserted.

In the answer, respondent argues that although defense counsel could have sought

such a limiting instruction, his decision not to do so may have been based on a desire not to call

the jury's attention to this evidence.  Whether counsel had a strategic reason for not requesting

this instruction as a matter of strategy is speculative.  However, because it is clear that petitioner

was not prejudiced by the failure to request this instruction, the instant ineffective assistance of

counsel claim is without merit.

Again, Sutch's initial statement that she was responsible for the stolen Sudafed

directly contradicted the clear, credible testimony of Deputy Jensen.  Had the jury received an

instruction that they could only consider Sutch's statement that she did not know how the

Sudafed got in the bucket as impeachment of her initial statement, and not for the truth of the

matter, it is extremely unlikely that the outcome of the trial would have been different.

After independently reviewing the record, the undersigned finds that the denial of

this claim by the California Supreme Court was not an unreasonable application of clearly

established Supreme Court authority.  Accordingly, this claim should be denied.

Claim 11

Petitioner argues that his appellate counsel was ineffective for failing to argue that

he was denied his right to confront witnesses against him by the introduction of Sutch's

statement that she did not know how the Sudafed got into the margarita bucket.

As set forth above in the discussion of claim 9, petitioner's claim alleging

violation of the Confrontation Clause is without merit.  Had appellate counsel raised this claim

on direct appeal, it almost certainly would have been denied.  Moreover, petitioner raised this

claim in a habeas corpus petition filed in the California Supreme Court which was denied on the

merits.  See Petitioner's Habeas Petition filed in the California Supreme Court lodged June 1,

1   2006.  The outcome would have been no different had this claim been raised on direct appeal.

2   Petitioner was not prejudiced by appellate counsel's failure to raise this claim.

3            After independently reviewing the record, the undersigned finds that the denial of

4   this claim by the California Supreme Court was not an unreasonable application of clearly

5   established Supreme Court authority.  Accordingly, this claim should be denied.

6            C.  Claims 12 and 13

7            Claims 12 and 13 concern the trial court's denial of his motion for substitute

8   counsel.

9            *Legal Standard*

10           Denial of a motion pursuant to People v. Marsden, 2 Cal.3d 118 (1970), may

11   implicate the Sixth Amendment right to counsel.  Schell v. Witek, 218 F.3d 1017, 1023 (9th Cir.

12   2000) (en banc). Therefore, when a criminal defendant makes a request for substitution of

13   counsel, the trial court is constitutionally required to inquire into the defendant's reasons for

14   wanting a new attorney.  Schell, 218 F.3d at 1025 ("[I]t is well established and clear that the

15   Sixth Amendment requires on the record an appropriate inquiry into the grounds for such a

16   motion, and that the matter be resolved on the merits before the case goes forward."); see also

17   Stenson v. Lambert, 504 F.3d 873, 886 (9th Cir. 2007) ("A trial court's inquiry regarding

18   counsel's performance on a motion to substitute counsel should be such necessary inquiry as

19   might ease the defendant's dissatisfaction, distrust and concern.") (citation and internal quotation

20   marks omitted).  For an indigent defendant, such an inquiry can serve to protect against

21   constitutional injury because the failure to provide substituted counsel "may result in a denial of

22   the constitutional right to effective assistance of counsel if the defendant and his attorney are

23   embroiled in an 'irreconcilable conflict.'"  United States v. Mills, 597 F.2d 693, 700 (9th Cir.

24   1979) (internal citations omitted).

25           In reviewing a federal habeas claim based on the denial of a substitution motion,

26   "the ultimate constitutional question the federal courts must answer" is whether the state trial

court's disposition of the motion violated a petitioner''s constitutional rights because the conflict between the petitioner and appointed counsel "had become so great that it resulted in a total lack of communication or other significant impediment that resulted in turn in an attorney-client relationship that fell short of that required by the Sixth Amendment." Schell, 218 F.3d at 1026. If the reviewing court determines that a conflict developed between the petitioner and appointed counsel so serious that it "resulted in the constructive denial of assistance of counsel, no further showing of prejudice is required." Schell, 218 F.3d at 1027-28 (citing Strickland, 466 U.S. at 692). On the other hand, "not every conflict or disagreement between the defendant and counsel implicates Sixth Amendment rights." Schell, 218 F.3d at 1027 (citing Morris v. Slappy, 461 U.S. 1, 13-14 (1983) (holding that the Sixth Amendment does not guarantee a "meaningful relationship" between defendant and counsel)); see also Stenson, 504 F.3d at 886 ("An irreconcilable conflict in violation of the Sixth Amendment occurs only where there is a complete breakdown in communication between the attorney and client, and the breakdown prevents effective assistance of counsel.  Disagreements over strategic or tactical decisions do not rise to [the] level of a complete breakdown in communication.")

> As explained by the Ninth Circuit:
>
> The test for determining whether the trial judge should have granted a substitution motion is the same as the test for determining whether an irreconcilable conflict existed. The court must consider: (1) the extent of the conflict; (2) whether the trial judge made an appropriate inquiry into the extent of the conflict; and (3) the timeliness of the motion to substitute counsel.

Daniels v. Woodford, 428 F.3d 1181, 1197-98 (9th Cir. 2005) (citations omitted).

A trial judge must also order a substitution of counsel if, after a hearing, the defendant demonstrates the existence of "an actual conflict of interest." Jackson v. Ylst, 921 F.2d 882, 888 (1990).

*Background*

On February 14, 2001, trial counsel filed a motion to withdraw as petitioner's counsel. (CT at 111-18.) The grounds for this motion were that the day before, on February 13,

2001, trial counsel became aware that the Public Defender's Office, for whom he worked, was concurrently representing defendant's former wife in a Child Protective Services ("CPS") action. (CT at 111.)  Trial counsel was employed as a contract attorney by the Public Defender's office. (RT at 60.)  Petitioner had asked trial counsel to have no contact with any other lawyer within the Public Defender's Office relative to his criminal case, as the attorney representing his former wife was attempting to gain custody of the children.  (CT at 112.)   Petitioner was apparently concerned that information regarding the criminal case could be used against him in the CPS action in which he was represented by private counsel.  (RT at 35.)

In the motion to withdraw, trial counsel also stated that Sandra Leggio, the deputy public defender representing petitioner's former wife, had asked trial counsel about his representation of petitioner.  (CT at 112.)  Trial counsel told her that he represented petitioner in a criminal action, but gave her no other information.  (CT at 112.)  Trial counsel stated that petitioner felt that this communication was in direct contravention of his instructions to have no contact with any other lawyer from the Public Defender's Office regarding his criminal case and had created a conflict.  (CT at 112.)

At the hearing on the motion to withdraw, trial counsel told the court that he was "concerned about the inevitable contact that took place between that attorney across the street and myself as creating a problem with even the appearance of impropriety relative to my representation of Mr. Benjamin..."  (RT at 32.)  Trial counsel also told the court that he was the appellate attorney for the Public Defender's office.  (RT at 33.)  If petitioner's former wife lost her case, i.e., her parental rights were terminated, it would be trial counsel's job to file an appeal on her behalf.  (RT at 33-34.)  In the CPS case, petitioner was represented by private counsel. (RT at 35.)

The trial judge denied the motion to withdraw based upon finding no evidence of an actual conflict.  (RT at 37.)  The trial judge noted that if an appeal needed to be filed on behalf of petitioner's former wife, another lawyer could be appointed to do the appeal.  (RT at 38.)  The

1    trial judge also found that petitioner should have brought the issue up much sooner, in effect

2    finding the request untimely.  (RT at 37-38.)

3           Immediately after the denial of the motion to withdraw, petitioner made a

4    Marsden motion requesting substitute counsel.  At the hearing on this motion, petitioner gave

5    several reasons for wanting new counsel.  Petitioner said that at the previous hearing it seemed

6    like counsel and his investigator were trying to talk him into taking a deal when he had told them

7    that he did not want to.  (RT at 41.)   Petitioner stated that trial counsel told him that a tape from

8    Winco existed showing what he did.  (RT at 49.)  Trial counsel told him that when he got the

9    tape, they would have another meeting.  (RT at 49.)  It turned out that the tape could not be

10   found.  (RT at 51.)  Petitioner also complained that he had tried to get into trial counsel's office

11   to talk to him but could not.  (RT at 48-49.)  Petitioner had met with trial counsel two to three

12   times in his office but the majority of his contacts with counsel were in the courtroom.  (RT at

13   56.)

14          Petitioner next told the trial court that the previous day he had told his counsel not

15   to tell anyone at the Public Defender's office that he (petitioner) had a CPS case.  (RT at 42.)

16   The CPS case had ended the previous day.  (RT at 43.)  Right after this conversation, petitioner

17   saw his counsel talking to Ms. Leggio, a lawyer with the Public Defender's office.  (Id.)

18   Petitioner stated that trial counsel allegedly told Ms. Leggio that petitioner had a criminal

19   proceeding across the street and "we need to talk."  (Id.)  Petitioner stated that this made him

20   unable to trust trial counsel.  (Id. at 43.)  Trial counsel later told petitioner that, by law, he was

21   required to tell Ms. Leggio that he was representing petitioner.  (Id.)

22          Trial counsel went on to explain that both he and Ms. Leggio worked for the

23   Public Defender's office.  (RT at 57.)  Trial counsel was employed as a contract attorney by the

24   Public Defender's office.  (RT at 60.)  When Ms. Leggio approached trial counsel the previous

25   day, she assumed that he had been privately retained.  (Id.)  It turned out that trial counsel

26   represented petitioner through a contract with the Public Defender's office.  (Id.)  Ms. Leggio

represented petitioner's former wife in a CPS case.  (RT at 58.)  In that case, petitioner was trying

to regain custody of his son.  (RT at 44.)   Trial counsel told Ms. Leggio that he represented

petitioner in a criminal matter.  (RT at 61.)  He gave her no other information about the case.

(Id.)  Trial counsel was concerned that the Public Defender's office had a conflict by

Ms. Leggio's representation of petitioner's former wife and his representation of petitioner.  (RT

at 61-62.)  Up until that time, the juvenile court where the CPS proceedings were occurring was

unaware that petitioner had felony charges pending.  (RT at 59.)

Trial counsel told the court that he believed that a breakdown in his relationship

with petitioner had occurred based on his conversation with Ms. Leggio and her representation of

petitioner's former wife.  (RT at 57-58.)  Trial counsel stated that it was "hard to say that

[petitioner] doesn't have a basis wrong or right for feeling that way."  (RT at 58.)

Toward the end of the hearing petitioner made the following comments regarding

counsel's communication with Ms. Leggio:

> Yeah.  I'll just say one more thing that, you know, I just asked him not to say
> anything.  I didn't tell him not to talk to anyone.  I said don't tell anyone about my
> case across the street.  How can I give my full trust to an attorney that I just said
> don't say nothing when there is no law saying that he had to say anything?  He
> could have walked away and not said nothing.  He did what I asked him not to do
> as soon as I got it out of my mouth and says, bam, he's got a case across the street.
> Exactly what I asked him not to do.
>
> How can I get a fair shake at trial when that happens?  I don't trust him.  I think
> he's a fine attorney.  I do.  And he's done his job and he's proven he's doing his
> job here.  How can I – do you see my point of view?  How can I feel like, you
> know, you see – if you want me to be quiet I will.

(RT at 62-63.)

Petitioner went on to tell the court that he did not think the Public Defender's

officer or trial counsel was prejudiced against him.  (RT at 64.)

The trial court denied petitioner's motion for substitute counsel finding that trial

counsel had properly investigated the case and that he made no attempt to mislead petitioner or

coerce him to plead guilty.  (RT at 65.)  The trial court further found no breakdown in the

1    relationship between petitioner and trial counsel.  (Id.)  The fact that petitioner had

2    unsuccessfully tried to schedule a couple of meetings did not create a breakdown in the

3    relationship.  (RT at 66.)  In addition, the trial court found that petitioner could have told trial

4    counsel much sooner that his wife was represented by someone from the Public Defender's

5    office.  (Id.)  The trial court stated that petitioner put trial counsel on the spot the previous day

6    and it worked no injustice or bad result for petitioner.  (Id.)  Trial counsel had relayed the

7    information that he was representing petitioner to Ms. Leggio "who essentially did nothing with

8    it."  (RT at 59.)

9                    Analysis of Claim 12

10                    In claim 12, petitioner alleges that he was denied his Sixth Amendment right of

11    counsel by the trial court's failure to grant his motion for substitute counsel.

12                    The trial judge made an appropriate inquiry into petitioner's claims of conflict.

13    The trial judge's finding that trial counsel's communications with petitioner regarding the Winco

14    tape and pleading guilty did not result in complete breakdown in communication was supported

15    by the record.  The record did not show that trial counsel improperly tried to coerce petitioner

16    into pleading guilty or misrepresented the evidence.  In addition, the trial judge's finding that

17    petitioner's claims of inadequate contact with counsel did not cause a complete breakdown in

18    communication was well supported.

19                    Petitioner's claim that he had a conflict with counsel based on the Public

20    Defender's office simultaneous representation of his former wife in the CPS case suggested an

21    actual conflict.  As stated above, a trial judge must order a substitution of counsel if, after a

22    hearing, the defendant demonstrates the existence of "an actual conflict of interest."  Jackson v.

23    Ylst, 921 F.2d at 888.

24                    To establish an actual conflict of interest, the petitioner must show that his

25    interests "diverge[d] with respect to a material factual or legal issue or to a course of action."

26    Cuyler v. Sullivan, 446 U.S. 335, 356 n. 3 (1980) (Marshall, J., concurring in part and dissenting

in part).  Additionally, the petitioner must establish that the actual conflict adversely affected his counsel's performance.  Id. at 348.  The adverse performance prong is met if the attorney took action on behalf of one client that was necessarily adverse to the defense of the other or failed to take action on behalf of one because it would adversely affect the other.  See United States v. Tatum, 943 F.2d 370, 376 (4th Cir. 1991).  If the petitioner makes these showings, prejudice is presumed and he is entitled to habeas relief.  See Cuyler, 446 U.S. at 349-50.  The question of whether counsel labored under an actual conflict of interest that affected counsel's performance is a mixed question of law and fact that we review de novo.  Id. at 342.

In the instant case, petitioner's counsel told Ms. Leggio, the lawyer representing petitioner's former wife in the CPS action, that he represented petitioner in a criminal case.  This information could have adversely affected petitioner's CPS action – not his *criminal* action.  In any event, Ms. Leggio did nothing with this information.  In addition, there is no showing in the record that counsel's representation of petitioner was impacted in any way by the Public Defender's office simultaneous representation of petitioner's former wife in the CPS case.  In other words, there was no defense strategy or tactic that counsel abandoned as a result of the conflict.  See United States v. Shwayder, 312 F.3d 1109, 1118 (9th Cir. 2002) (alternatively describing the standard as requiring "that counsel was influenced in his basic strategic decisions" by the conflict (internal quotation marks omitted)).  Therefore, assuming counsel had a conflict of interest based on the Public Defender's office simultaneous representation of petitioner's former wife, petitioner has not demonstrated that the conflict adversely affected trial counsel's performance.

Petitioner is also alleging that counsel's communication with Ms. Leggio caused him to be unable to trust trial counsel, creating a breakdown in their relationship.  "Where a criminal defendant has, with legitimate reason, completely lost trust in his attorney, and the trial court refuses to remove the attorney, the defendant is constructively denied counsel."  Daniels v. Woodford, 428 F.3d 1181, 1197 (9th Cir. 2005).  "Even if [trial] counsel is competent, a serious

1   breakdown in communications can result in an inadequate defense." <u>U.S. v. Nguyen</u>, 262 F.3d

2   998, 1003 (9th Cir. 2001) (citing <u>United States v. Musa</u>, 220 F.3d 1096, 1102 (9th Cir. 2000));

3   <u>see also</u> <u>United States v. D'Amore</u>, 56 F.3d 1202, 1206 (9th Cir. 1995) ("[A] court may not deny

4   a substitution motion simply because [it] thinks current counsel's representation is adequate."),

5   overruled on other grounds by <u>United States v. Garrett</u>, 179 F.3d 1143 (9th Cir. 1999).

6         By finding that petitioner himself was at fault for putting counsel on the spot

7   when he was approached by Ms. Leggio, the trial judge in essence found that petitioner did not

8   have a legitimate reason not to trust trial counsel.  While the record does not indicate when

9   precisely petitioner became aware that his wife was represented by the public defender's office,

10   petitioner told the court that the hearing the previous day had been a one-year review.  (RT at

11   44.)  It is not unreasonable to infer that petitioner knew well before that day that his former wife

12   was represented by the Public Defender's office as the CPS proceedings were apparently

13   ongoing.  By waiting until the day of the hearing to provide counsel with this information,

14   petitioner placed counsel in the position of having to respond to Ms. Leggio's inquiries regarding

15   his representation of petitioner.

16         In addition, counsel acted appropriately during his conversation with Ms. Leggio.

17   Ms. Leggio approached counsel and asked him about his relationship with petitioner.  It would

18   have been very difficult for counsel just to "walk away," as suggested by petitioner.  In response,

19   trial counsel merely informed Ms. Leggio that he represented petitioner in a criminal case.  He

20   did not discuss the nature of the charges.

21         Because petitioner himself caused trial counsel to be placed in the position of

22   having to discuss his representation of petitioner with Ms. Leggio, and trial counsel then

23   conducted himself appropriately during that conversation, petitioner's claim that he could no

24   longer trust counsel was not legitimate.  Moreover, petitioner also told the trial court during the

25   <u>Marsden</u> hearing that he did not think that counsel was prejudiced against him and that counsel

26   had done a good job.  Petitioner's alleged mistrust did not cause a complete breakdown in the

1   attorney-client relationship.  Under these circumstances, the trial court properly denied

2   petitioner's motion for substitute counsel.

3   After independently reviewing the record, the undersigned finds that the denial of

4   this claim by the California Supreme Court was not an unreasonable application of clearly

5   established Supreme Court authority.  Accordingly, this claim should be denied.

6   Claim 13

7   In claim 13, petitioner alleges that appellate counsel was ineffective for failing to

8   raise the claim concerning the trial court's denial of his motion for substitute counsel on direct

9   appeal.  Because this claim is without merit, petitioner was not prejudiced by appellate counsel's

10  failure to raise this claim.  In addition, petitioner raised this claim in his habeas petition that was

11  filed in the California Supreme Court.  The California Supreme Court denied this claim on the

12  merits.  There is nothing in the record suggesting that the outcome would have been different had

13  petitioner raised this claim on direct appeal.

14  After independently reviewing the record, the undersigned finds that the denial of

15  this claim by the California Supreme Court was not an unreasonable application of clearly

16  established Supreme Court authority.  Accordingly, this claim should be denied.

17  D.  Claims 14-16

18  In claim 14, petitioner alleges that imposition of the upper term sentence for his

19  conviction for violating Cal. Health & Saf. Code § 11383(c)(1) violated the Sixth Amendment.

20  In particular, petitioner argues that imposition of the upper term violated Apprendi v. New

21  Jersey, 530 U.S. 466 (2000), and Blakely v. Washington, 542 U.S. 296 (2004).  In claim 15,

22  petitioner argues that his trial counsel was ineffective for failing to argue that imposition of the

23  upper term violated the Sixth Amendment.  In claim 16, petitioner argues that his appellate

24  counsel was ineffective for failing to argue that imposition of the upper term violated the Sixth

25  Amendment.

26  ////

If the undersigned was to find that the imposition of petitioner's upper term violated the Sixth Amendment, the appropriate relief would be for petitioner to be resentenced. However, petitioner has since been discharged from parole. The undersigned cannot order the relief sought in connection with claims 14-16.

In the context of habeas petitions, the case or controversy requirement warrants a finding of mootness if: (1) the petitioner has received the relief requested in the petition; or (2) the court is unable to provide the petitioner with the relief sought. See Munoz v. Rowland, 104 F.3d 1096, 1097-98 (9th Cir. 1997); Picrin-Peron v. Rison, 930 F.2d 773, 775-76 (9th Cir. 1991). Petitioner's claims alleging that imposition of the upper term violated the Sixth Amendment are moot because the court is unable to provide petitioner the relief sought in connection with these claims. Accordingly, claims 14-16 should be denied as moot.

E.  Claim 17

Petitioner argues that his counsel was ineffective for failing to request the sanitation of the record of a prior conviction or a limiting instruction concerning the use of the prior conviction. The California Court of Appeal denied this claim for the reasons stated herein:

A. Handling of Prior Conviction for Manufacturing

Defendant contends his attorney was ineffective in failing to seek redaction of the underlying facts of his prior conviction. We do not agree.

At trial, after the court stated that evidence related to defendant's prior conviction would be admissible, the prosecution stated that, rather than having witnesses testify about defendant's prior offense, it would simply introduce the packet containing the certified copy of conviction. The prosecution showed this multipage document to defense counsel, who stated he had no objection to its introduction.

During final argument, however, it became clear that defendant thought only the fact of defendant's conviction would be admitted, not the underlying facts surrounding the offense. The court noted that the packet included a factual basis for the conviction, and stated that it had understood the prosecution's motion as relating to admissibility of the entire packet, not simply the fact of defendant's conviction. The court therefore permitted the prosecution to describe defendant's prior offense in closing argument. The court reaffirmed this ruling in denying defendant's motions for mistrial and new trial.

Defendant now asserts that his attorney was ineffective in failing to seek redaction of the packet to eliminate the description of defendant's manufacturing effort.

The People respond that this decision was a matter of trial tactics. The record indicates otherwise. Discussions during closing argument indicate that defense counsel erroneously believed that none of the underlying facts relating to the conviction had been admitted into evidence. Given this misperception, the failure to seek redaction cannot be deemed a matter of tactics. Counsel's failure to seek redaction was not a conscious choice but instead resulted from the mistaken belief that this information had already been excluded.

Although counsel's failure to seek redaction was not a matter of trial tactics, neither is it evidence of ineffective assistance of counsel. As discussed at length above, the trial court ruled defendant's prior conviction for manufacturing methamphetamine to be admissible under sections 1101 and 352. The prosecution was entitled to introduce evidence of that offense to demonstrate defendant's intent. Nothing in the record suggests that the trial court would have limited that evidence to the stark fact of conviction, and not permitted the prosecution to introduce evidence relating to that offense. Unlike <u>People v. Guizar</u> (1986) 180 Cal.App.3d 487, 491-492, the probative value of the other crimes evidence was high and outweighed any prejudicial effect. Counsel cannot be deemed ineffective for failing to seek redaction of admissible material. (<u>See</u> <u>People v. Osband</u> (1996) 13 Cal.4th 622, 678.)  "A defense counsel is not required to make futile motions or to indulge in idle acts to appear competent." (<u>People v. Torrez</u> (1995) 31 Cal.App.4th 1084, 1091.)

Defendant contends his attorney should have requested an instruction to limit the applicability of the prior conviction. The trial court instructed the jury pursuant to CALJIC No. 2.50 that defendant's prior conviction could be considered "for the limited purpose of determining if it tends to show the existence of the intent which is a necessary element of the crime charged [¶] or [a] motive for the commission of the crime charged." Defendant contends his attorney should have requested that this instruction be limited to specify that the prior conviction was relevant only on the question of intent for the possession charge and was irrelevant to the petty theft charge.

The failure to give a limiting instruction may well have been a matter of trial tactics, because the proposed instruction could have called unwanted attention to the similarities between the prior conviction and the current charge. (<u>See</u> <u>People v. Hawkins</u> (1995) 10 Cal.4th 920, 942, overruled on other grounds in <u>People v. Blakeley</u> (2000) 23 Cal.4th 82, 89; <u>People v. Johnson</u> (1993) 6 Cal.4th 1, 49, 50.) A tactical decision cannot form the basis for a claim of ineffective assistance of counsel.

In any event, any error in failing to request such an instruction was harmless. The prior manufacturing conviction was relevant to establish defendant's intent in possessing Sudafed, and that was the focus of the prosecutor's arguments to the jury. The prior was dissimilar to, and had no bearing on, the petty theft charge, and it is unreasonable to think the jury somehow improperly utilized the prior conviction to establish the requisite intent for petty theft, i.e., that defendant took the property with the specific intent to permanently deprive the owner of that

property. (See CALJIC No. 14.41.) Counsel's failure to seek a limiting instruction does not constitute ineffective assistance of counsel.

Dkt. 13, Exhibit 13, pp. 7-11.

For the reasons stated by the California Court of Appeal, this claim of ineffective assistance of counsel is without merit. The denial of this claim by the California Court of Appeal was not an unreasonable application of clearly established Supreme Court authority. Accordingly, this claim should be denied.

F. Claim 18

Petitioner alleges that trial counsel was ineffective for failing to request an eyewitness identification instruction. The California Court of Appeal denied this claim for the reasons stated herein:

Defendant contends that, because so much of the prosecution's case depended on the observations of the store security guard, his attorney should have requested CALJIC Nos. 2.91 ("Burden of Proving Identity Based Solely on Eyewitnesses") and 2.92 ("Factors to Consider in Proving Identity by Eyewitness Testimony"). He asserts that the failure to request these instructions constituted ineffective assistance of counsel.

Even if we assume for purposes of argument that these instructions would have been appropriate, the failure to request them was not prejudicial. The court gave other instructions relating to the assessment of witness credibility, including CALJIC Nos. 2.20 ("Believability of Witness"), 2.21.1 ("Discrepancies in Testimony"), 2.22 ("Weighing Conflicting Testimony"), 2.27 ("Sufficiency of Testimony of One Witness") and 2.90 ("Presumption of Innocence-Reasonable Doubt-Burden of Proof"). These instructions are "sufficient to inform the jury that the prosecution had the burden of establishing identity, and that defendant should be acquitted in the event the jury harbored a reasonable doubt on the issue of identity." (People v. Alcala (1992) 4 Cal.4th 742, 803.)

Thus, even if counsel should have requested CALJIC Nos. 2.91 and 2.92, the failure to do so was not prejudicial, and defendant's claim of ineffective assistance of counsel necessarily fails.

Dkt. No. 13, Exhibit A, pp. 11-12.

For the reasons stated by the California Court of Appeal, this claim of ineffective assistance of counsel is without merit. The denial of this claim by the California Court of Appeal was not an unreasonable application of clearly established Supreme Court authority.

1    Accordingly, this claim should be denied.

2            G.  Claim 19

3            Petitioner alleges that the trial court erred in failing to instruct sua sponte on the

4    law of accomplices.

5            *Legal Standard*

6            A challenge to jury instructions does not generally state a federal constitutional

7    claim.  See Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983); see also Middleton v.

8    Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985).  Habeas corpus relief is unavailable for alleged error

9    in the interpretation or application of state law.  Estelle v. McGuire, 502 U.S. 62 (1981); see also

10   Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright, 786 F.2d 1378, 1381

11   (9th Cir. 1986).  The standard of review for a federal habeas court "is limited to deciding whether

12   a conviction violated the Constitution, laws, or treaties of the United States (citations omitted)."

13   Estelle v. McGuire, 502 U.S. at 68.  In order for error in the state trial proceedings to reach the

14   level of a due process violation, the error had to be one involving "fundamental fairness."  Id. at

15   73.  The Supreme Court has defined the category of infractions that violate fundamental fairness

16   very narrowly.  Id.

17           When what is at issue is the failure to give an instruction, petitioner's burden is

18   "especially heavy" because it has been held that "[a]n omission or an incomplete instruction is

19   less likely to be prejudicial than a misstatement of the law."  Henderson v. Kibbe, 431 U.S. 145,

20   155 (1977).  Moreover, a trial judge need not instruct on a defense which would be inconsistent

21   with petitioner's theory of the case.  Bashor v. Risley, 730 F.2d 1228, 1240 (9th Cir. 1984).

22   Failure to give a jury instruction under these circumstances will not amount to a due process

23   violation.  Id.

24           The burden upon petitioner is greater yet in a situation where he claims that the

25   trial court did not give an instruction sua sponte.  To the extent that petitioner rests his claim on a

26   duty to give an instruction sua sponte under rules of state law, petitioner has stated no federal

41

claim.  Indeed, in the failure to give a lesser included offense instruction context, the Ninth

Circuit has held in non-capital cases that the failure to give the instruction states no federal claim

whatsoever.  James v. Reece, 546 F.2d 325, 327 (9th Cir. 1976).  Therefore, in order to violate

due process, the impact on the proceeding from failure to give an instruction sua sponte must be

of a very substantial magnitude.

Furthermore, the Supreme Court has held that there is no unreasonable application

of federal law where a state appellate court decided that a jury instruction's single incorrect

statement of the "imperfect self-defense" standard did not render the instruction reasonably likely

to have misled the jury.  Middleton v. McNeil, 541 U.S. 433 (2004).

*Analysis*

The California Court of Appeal denied this claim for the reasons stated herein:

Defendant contends the trial court had a sua sponte obligation to instruct on the
definition of an "accomplice" (CALJIC No. 3.10), to instruct that Andrea Sutch
was an accomplice as a matter of law (CALJIC No. 3.16), and to instruct that the
incriminating statements of an accomplice should be viewed with caution
(CALJIC No. 3.18). Defendant contends the court's failure to give these
instructions compels reversal. Again, we disagree.

Two points made by the People warrant comment. First, citing People v. Williams
(1988) 45 Cal.3d 1268, 1314, the People contend that, because Sutch's statements
were both favorable and unfavorable to defendant, the court had no sua sponte
duty to give CALJIC No. 3.18. However, in People v. Guiuan (1998) 18 Cal.4th
558, 569, the Supreme Court concluded that this instruction should be modified to
apply only to testimony that tends to incriminate the defendant, and CALJIC
No. 3.18 was revised accordingly. The People's claim is predicated on outdated
law.

Second, the People assert these instructions are inapplicable because Sutch was
not a witness and did not actually testify at trial. Instead, a police officer recounted
Sutch's out-of-court claim that she had no idea how the Sudafed got into the
margarita mix pail, a claim that implicated defendant. The California Supreme
Court has explained that Penal Code section 1111 and CALJIC No. 3.11
("Testimony of Accomplice Must Be Corroborated") apply with equal force when
an accomplice's out-of-court statements are used as substantive evidence of a
defendant's guilt. (See, e.g., People v.. Andrews (1989) 49 Cal.3d 200, 214;
People v. Belton (1979) 23 Cal.3d 516, 524-526.) While defendant does not
include CALJIC No. 3 .11 in his litany of wrongfully omitted instructions, the
same analysis applies. The fact that Sutch did not testify in person has no bearing
on the question of whether the court erred in failing to advise the jury that
accomplice testimony should be viewed with caution. The principles behind the

instruction are the same, regardless of whether the accomplice testifies at trial or through the admission of an out-of-court statement.

That said, the omission of CALJIC No. 3.18, "even if erroneous, is deemed harmless where there was ample evidence corroborating the witness's testimony." (People v. Arias (1996) 13 Cal.4th 92, 143.) Corroboration may be slight and entitled to little consideration when standing alone. Although this evidence must relate to some element of the crime, it need not be sufficient in itself to establish every element of the charged offense. (People v. Zapien (1993) 4 Cal.4th 929, 982.)

Here, ample corroborating evidence was provided. The security guard described defendant as the person who placed the Sudafed in the margarita mix pail. A police officer described how Sudafed is used to manufacture methamphetamine. The prosecution introduced evidence that defendant had previously been convicted of manufacturing methamphetamine, which was relevant to establishing defendant's intent on this occasion. We note too, that Sutch's credibility and trustworthiness were vigorously challenged by defendant and the trial court instructed the jury that bias may be considered in assessing witness credibility. (CALJIC No. 2.20.)

Under these circumstances, the failure to give the cited accomplice instructions was harmless under either People v. Watson (1956) 46 Cal.2d 818, 836, or Chapman v. California (1967) 386 U.S. 18, 24.

Defendant contends that, while that may be the case under California law, the omission of these instructions implicates federal constitutional rights. He argues that the failure to give these accomplice instructions is a structural defect that lessens the prosecutor's burden of proof and is thus reversible per se. We do not agree. The prosecutor's burden of proof was clearly explained to the jury, and the absence of CALJIC No. 3.18 did not lessen that burden in any way, or otherwise violate due process. (See People v. Frye (1998) 18 Cal.4th 894, 966; People v. Arias, supra, 13 Cal.4th at p. 143.)

Dkt. No. 13, Exhibit 1, pp. 12-15.

For the reasons stated by the California Court of Appeal, the trial court's failure to sua sponte instruct on accomplice testimony did not violate fundamental fairness.  The denial of this claim by the California Court of Appeal was not an unreasonable application of clearly established Supreme Court authority.  Accordingly, this claim should be denied.

### H.  Claim 20

In claim 20, petitioner argues that his conviction should be reversed based on cumulative error.

The Supreme Court has clearly established that the combined effect of multiple

43

1  trial court errors violates due process where it renders the resulting criminal trial fundamentally

2  unfair." Parle v. Runnels, 505 F.3d 922, 927 (9th Cir. 2007), citing Chambers v. Mississippi,

3  410 U.S. 284, 298, 302-03 (1973) (combined effect of individual errors "denied [Chambers] a

4  trial in accord with traditional and fundamental standards of due process" and "deprived

5  Chambers of a fair trial").  "The cumulative effect of multiple errors can violate due process even

6  where no single error rises to the level of a constitutional violation or would independently

7  warrant reversal." Id., citing Chambers, 410 U.S. at 290 n. 3.

8        "Under traditional due process principles, cumulative error warrants habeas relief

9  only where the errors have 'so infected the trial with unfairness as to make the resulting

10  conviction a denial of due process.'" Id., quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643

11  (1974). "Such 'infection' occurs where the combined effect of the errors had a 'substantial and

12  injurious effect or influence on the jury's verdict.'" Id., quoting Brecht v. Abrahamson, 507 U.S.

13  619, 637 (1993) (internal quotations omitted).  "In simpler terms, where the combined effect of

14  individually harmless errors renders a criminal defense 'far less persuasive than it might

15  [otherwise] have been,' the resulting conviction violates due process." Id., citing Chambers,

16  410 U.S. at 294.

17        As discussed above, the undersigned has found no errors of constitutional

18  magnitude.  For that reason, petitioner's claim of cumulative error should be denied.  After an

19  independent review of the record, the undersigned finds that the denial of this claim by the

20  California Supreme Court was not an unreasonable application of clearly established Supreme

21  Court authority.

22        Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for

23  a writ of habeas corpus be denied.

24        If petitioner files objections, he shall also address if a certificate of appealability

25  should issue and, if so, as to which issues.  A certificate of appealability may issue under

26  28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a

1   constitutional right." 28 U.S.C. § 2253(c)(2).  The certificate of appealability must "indicate

2   which specific issue or issues satisfy" the requirement.  28 U.S.C. § 2253(c)(3).

3            These findings and recommendations are submitted to the United States District

4   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen

5   days after being served with these findings and recommendations, any party may file written

6   objections with the court and serve a copy on all parties.  Such a document should be captioned

7   "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

8   objections shall be filed and served within fourteen days after service of the objections.  The

9   parties are advised that failure to file objections within the specified time may waive the right to

10  appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

11  DATED:  November 8, 2010

12

13

14                                                 KENDALL J. NEWMAN
                                                   UNITED STATES MAGISTRATE JUDGE
15  benjamin.hab(2)

16

17

18

19

20

21

22

23

24

25

26